[No. S076061. Apr. 30, 2001.]

COMEDY III PRODUCTIONS, INC., Plaintiff and Respondent, v. GARY SADERUP, INC., et al., Defendants and Appellants.

## COUNSEL

Cooper, Kardaras & Scharf, Brand Cooper, Victor E. Aguilera, James C. Potepan, Edward C. Wilde and Stuart L. Brody for Defendants and Appellants.

Benjamin, Lugosi & Benjamin, Bela G. Lugosi, Robert N. Benjamin and Caroline H. Mankey for Plaintiff and Respondent.

Manatt, Phelps & Phillips and Mark S. Lee for The Autry Survivor's Trust, ETW Corporation, The Diana, Princess of Wales Memorial Fund and Elvis Presley Enterprises, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

Geffner & Bush, Leo Geffner and Jospeh A. Kohanski for Screen Actors Guild, Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

David S. Welkowitz as Amicus Curiae on behalf of Plaintiff and Respondent.

Margaret A. Boulware; Ross J. Charap; Morton D. Goldberg; Joseph N. Welch; Knobbe, Martens, Olson & Bear, Joseph F. Jennings, Joseph S. Cianfrani and Joseph R. Re for American Intellectual Property Law Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Kevin J. Leichter, Caroline H. Mankey; Law Offices of Robert A. Finkelstein and Robert A. Finkelstein for Wayne Enterprises, Inc., Sheffield Enterprises, Inc., Global Icons LLC and Groucho Marx Productions, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—A California statute grants the *right of publicity* to specified successors in interest of deceased celebrities, prohibiting any other person from using a celebrity's name, voice, signature, photograph, or likeness for commercial purposes without the consent of such successors. (Former Civ. Code, § 990.)[1] The United States Constitution prohibits the states from abridging, among other fundamental rights, freedom of speech. (U.S. Const., 1st and 14th Amends.) In the case at bar we resolve a conflict between these two provisions. The Court of Appeal concluded that the lithographs and silkscreened T-shirts in question here received no First Amendment protection simply because they were reproductions rather than original works of art. As will appear, this was error: reproductions are equally entitled to First Amendment protection. We formulate instead what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation. Applying this test to the present case, we conclude that there are no such creative elements here and that the right of publicity prevails. On this basis, we will affirm the judgment of the Court of Appeal.

## I. THE STATUTE

In this state the right of publicity is both a statutory and a common law right. The statutory right originated in Civil Code section 3344 (hereafter section 3344), enacted in 1971, authorizing recovery of damages by any living person whose name, photograph, or likeness has been used for commercial purposes without his or her consent. Eight years later, in *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150] (*Lugosi*), we also recognized a common law right of publicity, which the statute was said to complement (*id.* at p. 818 and fn. 6). But because the common law right was derived from the law of privacy,[2] we held in *Lugosi* that the cause of action did not survive the death of the person whose identity was exploited and was not descendible to his or her heirs or assignees. (25 Cal.3d at pp. 819-821.)

In 1984 the Legislature enacted an additional measure on the subject, creating a second statutory right of publicity that *was* descendible to the

---

[1]After we granted review, the Legislature renumbered the statute as section 3344.1 of the Civil Code. (Stats. 1999, ch. 998, § 1; *id.,* ch. 1000, § 9.5.) At the same time, it amended the wording of the statute in several respects. Because we interpret the former statute, we will refer to it throughout, in the present tense, as section 990.

[2]Specifically, from the fourth type of privacy invasion identified by Dean Prosser in his seminal article on the subject. (Prosser, *Privacy* (1960) 48 Cal. L.Rev. 383, 389 ["Appropriation, for the defendant's advantage, of the plaintiff's name or likeness"].)

heirs and assignees of deceased persons. (Stats. 1984, ch. 1704, § 1, p. 6169.) The statute was evidently modeled on section 3344: many of the key provisions of the two statutory schemes were identical. The 1984 measure is the statute in issue in the case at bar. At the time of trial and while the appeal was pending before the Court of Appeal, the statute was numbered section 990 of the Civil Code.

Section 990 declares broadly that "Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof." (*Id.*, subd. (a).) The amount recoverable includes "any profits from the unauthorized use," as well as punitive damages, attorney fees, and costs. (*Ibid.*)

The statute defines "deceased personality" as a person "whose name, voice, signature, photograph, or likeness has commercial value at the time of his or her death," whether or not the person actually used any of those features for commercial purposes while alive. (§ 990, subd. (h).)

The statute further declares that "The rights recognized under this section are property rights" that are transferable before or after the personality dies, by contract or by trust or will. (§ 990, subd. (b).) Consent to use the deceased personality's name, voice, photograph, etc., must be obtained from such a transferee or, if there is none, from certain described survivors of the personality. (*Id.*, subds. (c), (d).) Any person claiming to be such a transferee or survivor must register the claim with the Secretary of State before recovering damages. (*Id.*, subd. (f).)

The right to require consent under the statute terminates if there is neither transferee nor survivor (§ 990, subd. (e)), or 50 years after the personality dies (*id.*, subd. (g)).[3]

The statute provides a number of exemptions from the requirement of consent to use. Thus a use "in connection with any news, public affairs, or sports broadcast or account, or any political campaign" does not require consent. (§ 990, subd. (j).) Use in a "commercial medium" does not require consent solely because the material is commercially sponsored or contains

---

[3]Under the new statute, this period has increased to 70 years. (Civ. Code, § 3344.1, subd. (g).)

paid advertising; "Rather it shall be a question of fact whether or not the use . . . was so directly connected with" the sponsorship or advertising that it requires consent. (*Id.*, subd. (k).) Finally, subdivision (n) provides that "[a] play, book, magazine, newspaper, musical composition, film, radio or television program" (*id.*, subd. (n)(1)), work of "political or newsworthy value" (*id.*, subd. (n)(2)), "[s]ingle and original works of fine art" (*id.*, subd. (n)(3)), or "[a]n advertisement or commercial announcement" for the above works (*id.*, subd. (n)(4)) are all exempt from the provisions of the statute.

## II. FACTS

Plaintiff Comedy III Productions, Inc. (hereafter Comedy III), brought this action against defendants Gary Saderup and Gary Saderup, Inc. (hereafter collectively Saderup), seeking damages and injunctive relief for violation of section 990 and related business torts.[4] The parties waived the right to jury trial and the right to put on evidence, and submitted the case for decision on the following stipulated facts:

Comedy III is the registered owner of all rights to the former comedy act known as The Three Stooges, who are deceased personalities within the meaning of the statute.

Saderup is an artist with over 25 years' experience in making charcoal drawings of celebrities. These drawings are used to create lithographic and silkscreen masters, which in turn are used to produce multiple reproductions in the form, respectively, of lithographic prints and silkscreened images on T-shirts. Saderup creates the original drawings and is actively involved in the ensuing lithographic and silkscreening processes.

Without securing Comedy III's consent, Saderup sold lithographs and T-shirts bearing a likeness of The Three Stooges reproduced from a charcoal drawing he had made. These lithographs and T-shirts did not constitute an advertisement, endorsement, or sponsorship of any product.

Saderup's profits from the sale of unlicensed lithographs and T-shirts bearing a likeness of The Three Stooges was $75,000 and Comedy III's reasonable attorney fees were $150,000.

On these stipulated facts the court found for Comedy III and entered judgment against Saderup awarding damages of $75,000 and attorney fees of

---

[4]The action was also commenced by an unrelated celebrity whose claim was settled before trial.

$150,000 plus costs. The court also issued a permanent injunction restraining Saderup from violating the statute by use of any likeness of The Three Stooges in lithographs, T-shirts, "or any other medium by which [Saderup's] art work may be sold or marketed." The injunction further prohibited Saderup from "Creating, producing, reproducing, copying, distributing, selling or exhibiting any lithographs, prints, posters, t-shirts, buttons, or other goods, products or merchandise of any kind, bearing the photograph, image, face, symbols, trademarks, likeness, name, voice or signature of The Three Stooges or any of the individual members of The Three Stooges." The sole exception to this broad prohibition was Saderup's original charcoal drawing from which the reproductions at issue were made.

Saderup appealed. The Court of Appeal modified the judgment by striking the injunction. The court reasoned that Comedy III had not proved a likelihood of continued violation of the statute, and that the wording of the injunction was overbroad because it exceeded the terms of the statute and because it "could extend to matters and conduct protected by the First Amendment . . . ."

The Court of Appeal affirmed the judgment as thus modified, however, upholding the award of damages, attorney fees, and costs. In so doing, it rejected Saderup's contentions that his conduct (1) did not violate the terms of the statute, and (2) in any event was protected by the constitutional guaranty of freedom of speech.

We granted review to address these two issues.[5]

### III. DISCUSSION

#### A. *The Statutory Issue*

■ Saderup contends the statute applies only to uses of a deceased personality's name, voice, photograph, etc., for the purpose of advertising, selling, or soliciting the purchase of, products or services. He then stresses the stipulated fact (and subsequent finding) that the lithographs and T-shirts at issue in this case did not constitute an advertisement, endorsement, or sponsorship of any product. He concludes the statute therefore does not apply in the case at bar. As will appear, the major premise of his argument— his construction of the statute—is unpersuasive.

---

[5] In its brief on the merits plaintiff asks us also to review the Court of Appeal's ruling striking the injunction. We decline to do so: plaintiff failed to raise this issue in its answer to the petition for review (Cal. Rules of Court, rule 28(e)(5)) and in any event presents little or no argument in support of the point.

As noted above, the statute makes liable any person who, without consent, uses a deceased personality's name, voice, photograph, etc., "in any manner, *on or in products, merchandise, or goods, or* for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services . . . ." (§ 990, subd. (a), italics added.) Saderup's construction reads the emphasized phrase out of the statute. Yet the Legislature deliberately inserted it, as the following sequence of events demonstrates. When first enacted in 1971, section 3344—the companion statute applying to living personalities—contained no such phrase: the statute simply made liable any person who uses another's identity "in any manner, for purposes of advertising products, merchandise, goods or services, or for purposes of solicitation of" such purchases. (Stats. 1971, ch. 1595, § 1, p. 3426.) The Legislature inserted the phrase, "on or in products, merchandise, or goods, or," when it amended section 3344 in 1984. (Stats. 1984, ch. 1704, § 2, p. 6172.) And in the very same legislation, the Legislature adopted section 990 and inserted the identical phrase in that statute as well. (Stats. 1984, ch. 1704, § 1, p. 6169.)

We therefore give effect to the plain meaning of the statute: it makes liable any person who, without consent, uses a deceased personality's name, voice, photograph, etc., either (1) "on or in" a product, *or* (2) in "advertising or selling" a product. The two uses are not synonymous: in the apt example given by the Court of Appeal, there is an obvious difference between "placing a celebrity's name on a 'special edition' of a vehicle, and using that name in a commercial to endorse or tout the same or another vehicle."

Applying this construction of the statute to the facts at hand, we agree with the Court of Appeal that Saderup sold more than just the incorporeal likeness of The Three Stooges. Saderup's lithographic prints of The Three Stooges are themselves tangible personal property, consisting of paper and ink, made as products to be sold and displayed on walls like similar graphic art. Saderup's T-shirts are likewise tangible personal property, consisting of fabric and ink, made as products to be sold and worn on the body like similar garments. By producing and selling such lithographs and T-shirts, Saderup thus used the likeness of The Three Stooges "on . . . products, merchandise, or goods" within the meaning of the statute.[6]

Saderup contends this construction is inconsistent with precedent, but the cases on which he relies are readily distinguishable. *Eastwood v. Superior*

---

[6]This conclusion is not inconsistent with the statement of the trial court that in the case at bar "the product consists of the likeness." The court did not make that statement in answering the statutory contention we address here, but in response to the constitutional claim we address later in this opinion (pt. III.B., *post*). On the statutory issue, the court expressly found that "the products sold by the defendants are, in fact, *lithographs and T-shirts* with the likeness of The Three Stooges." (Italics added.)

*Court* (1983) 149 Cal.App.3d 409, 417 [198 Cal.Rptr. 342], involving section 3344, was decided when that statute prohibited the use of another's identity only for advertising purposes. And although *Newcombe v. Adolf Coors Co.* (9th Cir. 1998) 157 F.3d 686 was decided after the Legislature inserted the phrase, "on or in products, merchandise, or goods," into section 3344, the case is not authority for reading that phrase out of the statute or section 990: because the sole issue in the case was the unauthorized use of a celebrity's likeness in a beer advertisement, the court quoted only those portions of section 3344 dealing with advertisements. (*Newcombe*, at p. 692.)

### B. *The Constitutional Issue*

 Saderup next contends that enforcement of the judgment against him violates his right of free speech and expression under the First Amendment. He raises a difficult issue, which we address below.

The right of publicity is often invoked in the context of commercial speech when the appropriation of a celebrity likeness creates a false and misleading impression that the celebrity is endorsing a product. (See *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093; *Midler v. Ford Motor Co.* (9th Cir. 1988) 849 F.2d 460.) Because the First Amendment does not protect false and misleading commercial speech (*Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563-564 [100 S.Ct. 2343, 2350, 65 L.Ed.2d 341]), and because even nonmisleading commercial speech is generally subject to somewhat lesser First Amendment protection (*Central Hudson*, at p. 566 [100 S.Ct. at p. 2351]), the right of publicity may often trump the right of advertisers to make use of celebrity figures.

But the present case does not concern commercial speech. As the trial court found, Saderup's portraits of The Three Stooges are expressive works and not an advertisement for or endorsement of a product. Although his work was done for financial gain, "[t]he First Amendment is not limited to those who publish without charge. . . . [An expressive activity] does not lose its constitutional protection because it is undertaken for profit." (*Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 868 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, C. J.) (*Guglielmi*).)[7]

The tension between the right of publicity and the First Amendment is highlighted by recalling the two distinct, commonly acknowledged purposes

---

[7]Chief Justice Bird's concurring opinion in *Guglielmi* was signed by Justices Tobriner and Manuel. The principles enunciated in her concurrence were also endorsed by Justice Newman, who nonetheless did not join the opinion because he shared the view of the majority that the common law right of publicity was not descendible (the case predated the passage of section 990). (*Guglielmi, supra,* 25 Cal.3d at p. 876.) Therefore, Chief Justice Bird's views in

of the latter. First, " 'to preserve an uninhibited marketplace of ideas' and to repel efforts to limit the ' "uninhibited, robust and wide-open" debate on public issues.' " (*Guglielmi, supra*, 25 Cal.3d at p. 866.) Second, to foster a "fundamental respect for individual development and self-realization. The right to self-expression is inherent in any political system which respects individual dignity. Each speaker must be free of government restraint regardless of the nature or manner of the views expressed unless there is a compelling reason to the contrary." (*Ibid.*, fn. omitted; see also Emerson, The System of Freedom of Expression (1970) pp. 6-7.)

The right of publicity has a potential for frustrating the fulfillment of both these purposes. Because celebrities take on public meaning, the appropriation of their likenesses may have important uses in uninhibited debate on public issues, particularly debates about culture and values. And because celebrities take on personal meanings to many individuals in the society, the creative appropriation of celebrity images can be an important avenue of individual expression. As one commentator has stated: "Entertainment and sports celebrities are the leading players in our Public Drama. We tell tales, both tall and cautionary, about them. We monitor their comings and goings, their missteps and heartbreaks. We copy their mannerisms, their styles, their modes of conversation and of consumption. Whether or not celebrities are 'the chief agents of moral change in the United States,' they certainly are widely used—far more than are institutionally anchored elites—to symbolize individual aspirations, group identities, and cultural values. Their images are thus important expressive and communicative resources: the peculiar, yet familiar idiom in which we conduct a fair portion of our cultural business and everyday conversation." (Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights* (1993) 81 Cal. L.Rev. 125, 128 (Madow), italics and fns. omitted.)

As Madow further points out, the very importance of celebrities in society means that the right of publicity has the potential of censoring significant expression by suppressing alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the celebrity's meaning. (Madow, *supra*, 81 Cal. L.Rev. at pp. 143-145; see also Coombe, *Author/izing the Celebrity: Publicity Rights, Postmodern Politics, and Unauthorized Genders* (1992) 10 Cardozo Arts and Ent. L.J. 365, 377-388.) A majority of this court recognized as much in *Guglielmi*: "The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment." (*Guglielmi, supra*, 25 Cal.3d at p. 869.)

---

*Guglielmi* commanded the support of the majority of the court. Hereafter, all references to *Guglielmi* in this opinion will be to the Chief Justice's opinion.

For similar reasons, speech about public figures is accorded heightened First Amendment protection in defamation law. As the United States Supreme Court held in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789], public figures may prevail in a libel action only if they prove that the defendant's defamatory statements were made with actual malice, i.e., actual knowledge of falsehood or reckless disregard for the truth, whereas private figures need prove only negligence. (*Id.* at pp. 328, 342, 344-345 [94 S.Ct. at pp. 3001, 3008, 3009-3010].) The rationale for such differential treatment is, first, that the public figure has greater access to the media and therefore greater opportunity to rebut defamatory statements, and second, that those who have become public figures have done so voluntarily and therefore "invite attention and comment." (*Id.* at pp. 344-345 [94 S.Ct. at p. 3010].) Giving broad scope to the right of publicity has the potential of allowing a celebrity to accomplish through the vigorous exercise of that right the censorship of unflattering commentary that cannot be constitutionally accomplished through defamation actions.

Nor do Saderup's creations lose their constitutional protections because they are for purposes of entertaining rather than informing. As Chief Justice Bird stated in *Guglielmi*, invoking the dual purpose of the First Amendment: "Our courts have often observed that entertainment is entitled to the same constitutional protection as the exposition of ideas. That conclusion rests on two propositions. First, '[t]he line between informing and entertaining is too elusive for the protection of the basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another doctrine.'" (*Guglielmi, supra,* 25 Cal.3d at p. 867, fn. omitted.) "Second, entertainment, as a mode of self-expression, is entitled to constitutional protection irrespective of its contribution to the marketplace of ideas. 'For expression is an integral part of the development of ideas, of mental exploration and of the affirmation of self. The power to realize his potentiality as a human being begins at this point and must extend at least this far if the whole nature of man is not to be thwarted.'" (*Ibid.*)

Nor does the fact that expression takes a form of nonverbal, visual representation remove it from the ambit of First Amendment protection. In *Bery v. City of New York* (2d Cir. 1996) 97 F.3d 689, the court overturned an ordinance requiring visual artists—painters, printers, photographers, sculptors, etc.—to obtain licenses to sell their work in public places, but exempted the vendors of books, newspapers or other written matter. As the court stated: "Both the [district] court and the City demonstrate an unduly restricted view of the First Amendment and of visual art itself. Such myopic vision not only overlooks case law central to First Amendment jurisprudence

but fundamentally misperceives the essence of visual communication and artistic expression. Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection. . . . One cannot look at Winslow Homer's paintings on the Civil War without seeing, in his depictions of the boredom and hardship of the individual soldier, expressions of anti-war sentiments, the idea that war is not heroic." (*Id.* at p. 695.)

Moreover, the United States Supreme Court has made it clear that a work of art is protected by the First Amendment even if it conveys no discernable message: "[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' [citation], would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 569 [115 S.Ct. 2338, 2345, 132 L.Ed.2d 487].)

Nor does the fact that Saderup's art appears in large part on a less conventional avenue of communications, T-shirts, result in reduced First Amendment protection. As Judge Posner stated in the case of a defendant who sold T-shirts advocating the legalization of marijuana, "its T-shirts . . . are to [the seller] what the *New York Times* is to the Sulzbergers and the Ochs—the vehicle of her ideas and opinions." (*Ayres v. City of Chicago* (7th Cir. 1997) 125 F.3d 1010, 1017; see also *Cohen v. California* (1971) 403 U.S. 15 [91 S.Ct. 1780, 29 L.Ed.2d 284] [jacket with words "Fuck the Draft" on the back is protected speech].) First Amendment doctrine does not disfavor nontraditional media of expression.

But having recognized the high degree of First Amendment protection for noncommercial speech about celebrities, we need not conclude that all expression that trenches on the right of publicity receives such protection. The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility. "Often considerable money, time and energy are needed to develop one's prominence in a particular field. Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion. [Citations.] For some, the investment may eventually create considerable commercial value in one's identity." (*Lugosi, supra,* 25 Cal.3d at pp. 834-835 (dis. opn. of Bird, C. J.).)

The present case exemplifies this kind of creative labor. Moe and Jerome (Curly) Howard and Larry Fein fashioned personae collectively known as

The Three Stooges, first in vaudeville and later in movie shorts, over a period extending from the 1920's to the 1940's. (See Fleming, The Three Stooges: Amalgamated Morons to American Icons (1999) pp. 10-46.) The three comic characters they created and whose names they shared—Larry, Moe, and Curly—possess a kind of mythic status in our culture. Their journey from ordinary vaudeville performers to the heights (or depths) of slapstick comic celebrity was long and arduous. (*Ibid.*) Their brand of physical humor—the nimble, comically stylized violence, the "nyuk-nyuks" and "whoop-whoop-whoops," eye-pokes, slaps and head conks (see, e.g., Three Little Pigskins (Columbia Pictures 1934), Hoi Polloi (Columbia Pictures 1935), A Gem of a Jam (Columbia Pictures 1943), Micro-Phonies (Columbia Pictures 1945))—created a distinct comedic trademark. Through their talent and labor, they joined the relatively small group of actors who constructed identifiable, recurrent comic personalities that they brought to the many parts they were scripted to play. "Groucho Marx just being Groucho Marx, with his moustache, cigar, slouch and leer, cannot be exploited by others. Red Skelton's variety of self-devised roles would appear to be protectible, as would the unique personal creations of Abbott and Costello, Laurel and Hardy and others of that genre. . . . '[W]e deal here with actors portraying themselves and developing their own characters.' " (*Lugosi, supra,* 25 Cal.3d at pp. 825-826 (conc. opn. of Mosk, J.).)

In sum, society may recognize, as the Legislature has done here, that a celebrity's heirs and assigns have a legitimate protectible interest in exploiting the value to be obtained from merchandising the celebrity's image, whether that interest be conceived as a kind of natural property right or as an incentive for encouraging creative work. (See 1 McCarthy, The Rights of Publicity and Privacy (2d ed. 2000) §§ 2.2-2.7, pp. 2-1 to 2-22 (McCarthy).) Although critics have questioned whether the right of publicity truly serves any social purpose (see, e.g., Madow, *supra,* 81 Cal. L.Rev. at pp. 178-238), there is no question that the Legislature has a rational basis for permitting celebrities and their heirs to control the commercial exploitation of the celebrity's likeness.

Although surprisingly few courts have considered in any depth the means of reconciling the right of publicity and the First Amendment, we follow those that have in concluding that depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment. We begin with *Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 576 [97 S.Ct. 2849, 2857-2858, 53 L.Ed.2d 965] (*Zacchini*), the only United States Supreme Court case to directly address the right of publicity. Zacchini, the performer

of a human cannonball act, sued a television station that had videotaped and broadcast his entire performance without his consent. The court held the First Amendment did not protect the television station against a right of publicity claim under Ohio common law. In explaining why the enforcement of the right of publicity in this case would not violate the First Amendment, the court stated: " '[T]he rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay.' " (*Id.* at p. 576 [97 S.Ct. at p. 2857].) The court also rejected the notion that federal copyright or patent law preempted this type of state law protection of intellectual property: "[Copyright and patent] laws perhaps regard the 'reward to the owner [as] a secondary consideration,' [citation], but they were 'intended definitely to grant valuable, enforceable rights' in order to afford greater encouragement to the production of works of benefit to the public. [Citation.] The Constitution does not prevent Ohio from making a similar choice here in deciding to protect the entertainer's incentive in order to encourage the production of this type of work." (*Id.* at p. 577 [97 S.Ct. at p. 2858].)

To be sure, *Zacchini* was not an ordinary right of publicity case: the defendant television station had appropriated the plaintiff's entire act, a species of common law copyright violation. Nonetheless, two principles enunciated in *Zacchini* apply to this case: (1) state law may validly safeguard forms of intellectual property not covered under federal copyright and patent law as a means of protecting the fruits of a performing artist's labor; and (2) the state's interest in preventing the outright misappropriation of such intellectual property by others is not automatically trumped by the interest in free expression or dissemination of information; rather, as in the case of defamation, the state law interest and the interest in free expression must be balanced, according to the relative importance of the interests at stake. (See *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 347-350 [94 S.Ct. at pp. 3010-3012].)

*Guglielmi* adopted a similar balancing approach. The purported heir of Rudolph Valentino filed suit against the makers of a fictional film based on the latter's life. *Guglielmi* concluded that the First Amendment protection of entertainment superseded any right of publicity. This was in contrast to the companion *Lugosi* case, in which Chief Justice Bird concluded in her dissenting opinion that there may be an enforceable right of publicity that would prevent the merchandising of Count Dracula using the likeness of Bela Lugosi, with whom that role was identified. (*Lugosi, supra,* 25 Cal.3d

at pp. 848-849 (dis. opn. of Bird, C. J.).) *Guglielmi* proposed a balancing test to distinguish protected from unprotected appropriation of celebrity likenesses: "an action for infringement of the right of publicity can be maintained only if the proprietary interests at issue clearly outweigh the value of free expression in this context." (*Guglielmi, supra,* 25 Cal.3d at p. 871.)

In *Estate of Presley v. Russen* (D.N.J. 1981) 513 F.Supp. 1339 (*Russen*), the court considered a New Jersey common law right of publicity claim by Elvis Presley's heirs against an impersonator who performed The Big El Show. The court implicitly used a balancing test similar to the one proposed in *Guglielmi.* Acknowledging that the First Amendment protects entertainment speech, the court nonetheless rejected that constitutional defense. "[E]ntertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment. As one authority has emphasized: 'The public interest in entertainment will support the sporadic, occasional and good-faith imitation of a famous person to achieve humor, to effect criticism or to season a particular episode, but it does not give a privilege to appropriate another's valuable attributes on a continuing basis as one's own without the consent of the other.' " (*Russen, supra,* 513 F.Supp. at pp. 1359-1360.) Acknowledging also that the show had some informational value, preserving a live Elvis Presley act for posterity, the court nonetheless stated: "This recognition that defendant's production has some value does not diminish our conclusion that the primary purpose of defendant's activity is to appropriate the commercial value of the likeness of Elvis Presley." (*Id.* at p. 1360.)

On the other side of the equation, the court recognized that the Elvis impersonation, as in *Zacchini,* represented " 'what may be the strongest case for a "right of publicity"—involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the appropriation of the very activity by which the entertainer acquired his reputation in the first place.' " (*Russen, supra,* 513 F.Supp. at p. 1361, quoting *Zacchini, supra,* 433 U.S. at p. 576 [97 S.Ct. at p. 2858].) Thus, in balancing the considerable right of publicity interests with the minimal expressive or informational value of the speech in question, the *Russen* court concluded that the Presley estate's request for injunctive relief would likely prevail on the merits. (*Russen,* at p. 1361; see also *Factors etc. Inc. v. Creative Card Co.* (S.D.N.Y. 1977) 444 F.Supp. 279 [poster of Elvis Presley labeled "In Memory . . . 1935-1977" did not possess sufficient newsworthiness to be eligible for First Amendment protection].)

In *Groucho Marx Productions, Inc. v. Day & Night Co.* (S.D.N.Y. 1981) 523 F.Supp. 485, reversed on other grounds (2d Cir. 1982) 689 F.2d 317, the

court considered a right of publicity challenge to a new play featuring characters resembling the Marx Brothers. The court found in favor of the Marx Brothers' heirs, rejecting a First Amendment defense. In analyzing that defense, the court posed a dichotomy between "works . . . designed primarily to promote the dissemination of thoughts, ideas or information through news or fictionalization," which would receive First Amendment protection, and "use of the celebrity's name or likeness . . . largely for commercial purposes, such as the sale of merchandise," in which the right of publicity would prevail. (523 F.Supp. at p. 492.) In creating this dichotomy, the court did not appear to give due consideration to forms of creative expression protected by the First Amendment that cannot be categorized as ideas or information. Moreover, the court, borrowing from certain copyright cases, seemed to believe that the validity of the First Amendment defense turned on whether the play was a parody, without explaining why other forms of creative appropriation, such as using established characters in new theatrical works to advance various creative objectives, were not protected by the First Amendment.[8] Nonetheless, the case is in line with *Zacchini*, *Guglielmi* and *Russen* in recognizing that certain forms of commercial exploitation of celebrities that violate the state law right of publicity do not receive First Amendment protection.

It is admittedly not a simple matter to develop a test that will unerringly distinguish between forms of artistic expression protected by the First Amendment and those that must give way to the right of publicity. Certainly, any such test must incorporate the principle that the right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals. Once the celebrity thrusts himself or herself forward into the limelight, the First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope. The necessary implication of this observation is that the right of publicity is essentially an economic right. What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the "name, voice, signature, photograph, or likeness" of the celebrity. (§ 990.)

Beyond this precept, how may courts distinguish between protected and unprotected expression? Some commentators have proposed importing the

---

[8]The Second Circuit Court of Appeals in *Groucho Marx Productions v. Day and Night Co.*, *supra*, 689 F.2d at pages 320-323, reversed the district court on the grounds that it had mistakenly applied New York rather than California law, and that under the latter at the time, the right of publicity terminated at the death of the celebrity. The court therefore had no occasion to rule on the validity of the district court's First Amendment analysis.

fair use defense from copyright law (17 U.S.C. § 107), which has the advantage of employing an established doctrine developed from a related area of the law. (See Barnett, *First Amendment Limits on the Right of Publicity* (1995) 30 Tort & Ins. L.J. 635, 650-657; Coyne, *Toward a Modified Fair Use Defense in Right of Publicity Cases* (1988) 29 Wm. & Mary L.Rev. 781, 812-820.) Others disagree, pointing to the murkiness of the fair use doctrine and arguing that the idea/expression dichotomy, rather than fair use, is the principal means of reconciling copyright protection and First Amendment rights. (2 McCarthy, *supra*, § 8.38, pp. 8-358 to 8-360; see also Kwall, *The Right of Publicity vs. The First Amendment: A Property and Liability Rule Analysis* (1994) 70 Ind. L.J. 47, 58, fn. 54.)

We conclude that a wholesale importation of the fair use doctrine into right of publicity law would not be advisable. At least two of the factors employed in the fair use test, "the nature of the copyrighted work" and "the amount and substantiality of the portion used" (17 U.S.C. § 107(2), (3)), seem particularly designed to be applied to the partial copying of works of authorship "fixed in [a] tangible medium of expression" (17 U.S.C. § 102); it is difficult to understand why these factors would be especially useful for determining whether the depiction of a celebrity likeness is protected by the First Amendment.

Nonetheless, the first fair use factor—"the purpose and character of the use" (17 U.S.C. § 107(1))—does seem particularly pertinent to the task of reconciling the rights of free expression and publicity. As the Supreme Court has stated, the central purpose of the inquiry into this fair use factor "is to see, in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation, [citations], or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.' [Citation.] Although such transformative use is not absolutely necessary for a finding of fair use, [citation], the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." (*Campbell v. Acuff-Rose Music, Inc.* (1994) 510 U.S. 569, 579 [114 S.Ct. 1164, 1171, 127 L.Ed.2d 500], fn. omitted.)

This inquiry into whether a work is "transformative" appears to us to be necessarily at the heart of any judicial attempt to square the right of publicity with the First Amendment. As the above quotation suggests, both the First Amendment and copyright law have a common goal of encouragement of free expression and creativity, the former by protecting such expression from

government interference, the latter by protecting the creative fruits of intellectual and artistic labor. (See 1 Nimmer on Copyright (2000 ed.) § 1.10, pp. 1-66.43 to 1-66.44 (Nimmer).) The right of publicity, at least theoretically, shares this goal with copyright law. (1 McCarthy, *supra*, § 2.6, pp. 2-14 to 2-19.) When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain,[9] directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist. (See *Zacchini, supra,* 433 U.S. at pp. 575-576 [97 S.Ct. at pp. 2857-2858].)

On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity. As has been observed, works of parody or other distortions of the celebrity figure are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect. (See *Cardtoons v. Major League Baseball Players* (10th Cir. 1996) 95 F.3d 959, 974 (*Cardtoons*).) Accordingly, First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity. The right-of-publicity holder continues to enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity.[10]

---

[9]Inquiry into the "purpose and character" of the work in copyright law also includes "whether such use is of a commercial nature or is for nonprofit educational purposes." (17 U.S.C. § 107(1).) It could be argued that reproduction of a celebrity likeness for noncommercial use—e.g., T-shirts of a recently deceased rock musician produced by a fan as a not-for-profit tribute—is a form of personal expression and therefore more worthy of First Amendment protection. This is an issue, however, that we need not decide in this case. It is undisputed that Saderup sold his reproductions for financial gain.

[10]There is a fourth factor in the fair use test not yet mentioned, "the effect of the use upon the potential market for or value of the copyrighted work" (17 U.S.C. § 107(4)), that bears directly on this question. We do not believe, however, that consideration of this factor would usefully supplement the test articulated here. If it is determined that a work is worthy of First Amendment protection because added creative elements significantly transform the celebrity depiction, then independent inquiry into whether or not that work is cutting into the market for the celebrity's images—something that might be particularly difficult to ascertain in the right of publicity context (see Madow, *supra,* 81 Cal. L.Rev. at pp. 221-222)—appears to be irrelevant. Moreover, this "potential market" test has been criticized for circularity: it could be argued that if a defendant has capitalized in any way on a celebrity's image, he or she has found a potential market and therefore could be liable for such work. (See 4 Nimmer, *supra,* § 13.05[A][4], pp. 13-183 to 13-184.) The "transformative" test elaborated in this opinion will, we conclude, protect the right-of-publicity holder's core interest in monopolizing the

Cardtoons, supra, 95 F.3d 959, cited by Saderup, is consistent with this "transformative" test. There, the court held that the First Amendment protected a company that produced trading cards caricaturing and parodying well-known major league baseball players against a claim brought under the Oklahoma right of publicity statute. The court concluded that "[t]he cards provide social commentary on public figures, major league baseball players, who are involved in a significant commercial enterprise, major league baseball," and that "[t]he cards are no less protected because they provide humorous rather than serious commentary." (*Cardtoons*, at p. 969.) The *Cardtoons* court weighed these First Amendment rights against what it concluded was the less-than-compelling interests advanced by the right of publicity outside the advertising context—especially in light of the reality that parody would not likely substantially impact the economic interests of celebrities—and found the cards to be a form of protected expression. (*Cardtoons*, at pp. 973-976.) While *Cardtoons* contained dicta calling into question the social value of the right of publicity, its conclusion that works parodying and caricaturing celebrities are protected by the First Amendment appears unassailable in light of the test articulated above.

█ We emphasize that the transformative elements or creative contributions that require First Amendment protection are not confined to parody and can take many forms, from factual reporting (see, e.g., *Rosemont Enterprises, Inc. v. Random House, Inc.* (1968) 58 Misc.2d 1 [294 N.Y.S.2d 122, 129], affd. mem. (1969) 32 A.D.2d 892 [301 N.Y.S.2d 948]) to fictionalized portrayal (*Guglielmi, supra*, 25 Cal.3d at pp. 871-872; see also *Parks v. Laface Records* (E.D.Mich. 1999) 76 F.Supp.2d 775, 779-782 [use of civil rights figure Rosa Parks in song title is protected expression]), from heavy-handed lampooning (see *Hustler Magazine v. Falwell* (1988) 485 U.S. 46 [108 S.Ct. 876, 99 L.Ed.2d 41]) to subtle social criticism (see Coplans et al., Andy Warhol (1970) pp. 50-52 [explaining Warhol's celebrity portraits as a critique of the celebrity phenomenon]).

Another way of stating the inquiry is whether the celebrity likeness is one of the "raw materials" from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness. And when we use the word "expression," we mean expression of something other than the likeness of the celebrity.

---

merchandising of celebrity images without unnecessarily impinging on the artists' right of free expression.

We further emphasize that in determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contribution—vulgar forms of expression fully qualify for First Amendment protection. (See, e.g., *Hustler Magazine v. Falwell, supra,* 485 U.S. 46; see also *Campbell v. Acuff-Rose Music, Inc., supra,* 510 U.S. at p. 582 [114 S.Ct. at p. 1173].) On the other hand, a literal depiction of a celebrity, even if accomplished with great skill, may still be subject to a right of publicity challenge. The inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the work.[11]

Furthermore, in determining whether a work is sufficiently transformative, courts may find useful a subsidiary inquiry, particularly in close cases: does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted? If this question is answered in the negative, then there would generally be no actionable right of publicity. When the value of the work comes principally from some source other than the fame of the celebrity—from the creativity, skill, and reputation of the artist—it may be presumed that sufficient transformative elements are present to warrant First Amendment protection. If the question is answered in the affirmative, however, it does not necessarily follow that the work is without First Amendment protection—it may still be a transformative work.

In sum, when an artist is faced with a right of publicity challenge to his or her work, he or she may raise as affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame.

Turning to the present case, we note that the trial court, in ruling against Saderup, stated that "the commercial enterprise conducted by [Saderup] involves the sale of lithographs and T-shirts which are not original single works of art, and which are not protected by the First Amendment; the enterprise conducted by [Saderup] was a commercial enterprise designed to

[11]Saderup also cites *ETW Corp. v. Jireh Publishing, Inc.* (N.D. Ohio 2000) 99 F.Supp.2d 829, 835-836, in which the court held that a painting consisting of a montage of likenesses of the well-known professional golfer Eldridge "Tiger" Woods, reproduced in 5,000 prints, was a work of art and therefore protected under the First Amendment. We disagree with the *ETW Corp.* court if its holding is taken to mean that any work of art, however much it trespasses on the right of publicity and however much it lacks additional creative elements, is categorically shielded from liability by the First Amendment. Whether the work in question in that case would be judged to be exempt from California's right of publicity, either under the First Amendment test articulated in this opinion or under the statutory exception for material of newsworthy value, is, of course, beyond the scope of this opinion.

generate profits solely from the use of the likeness of The Three Stooges which is the right of publicity . . . protected by section 990." Although not entirely clear, the trial court seemed to be holding that *reproductions* of celebrity images are categorically outside First Amendment protection. The Court of Appeal was more explicit in adopting this rationale: "Simply put, although the First Amendment protects speech that is sold [citation], reproductions of an image, made to be sold for profit do not per se constitute speech." But this position has no basis in logic or authority. No one would claim that a published book, because it is one of many copies, receives less First Amendment protection than the original manuscript. It is true that the statute at issue here makes a distinction between a single and original work of fine art and a reproduction. (§ 990, subd. (n)(3).) Because the statute evidently aims at preventing the illicit merchandising of celebrity images, and because single original works of fine art are not forms of merchandising, the state has little if any interest in preventing the exhibition and sale of such works, and the First Amendment rights of the artist should therefore prevail. But the inverse—that a reproduction receives no First Amendment protection—is patently false: a reproduction of a celebrity image that, as explained above, contains significant creative elements is entitled to as much First Amendment protection as an original work of art. The trial court and the Court of Appeal therefore erred in this respect.

Rather, the inquiry is into whether Saderup's work is sufficiently transformative. Correctly anticipating this inquiry, he argues that all portraiture involves creative decisions, that therefore no portrait portrays a mere literal likeness, and that accordingly all portraiture, including reproductions, is protected by the First Amendment. We reject any such categorical position. Without denying that all portraiture involves the making of artistic choices, we find it equally undeniable, under the test formulated above, that when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity. As is the case with fair use in the area of copyright law, an artist depicting a celebrity must contribute something more than a " ' "merely trivial" ' " variation, [but must create] something recognizably ' "his own" ' " (*L. Batlin & Son, Inc. v. Snyder* (2d Cir. 1976) 536 F.2d 486, 490), in order to qualify for legal protection.

On the other hand, we do not hold that all reproductions of celebrity portraits are unprotected by the First Amendment. The silkscreens of Andy Warhol, for example, have as their subjects the images of such celebrities as Marilyn Monroe, Elizabeth Taylor, and Elvis Presley. Through distortion

and the careful manipulation of context, Warhol was able to convey a message that went beyond the commercial exploitation of celebrity images and became a form of ironic social comment on the dehumanization of celebrity itself. (See Coplans et al., *supra*, at p. 52.)[12] Such expression may well be entitled to First Amendment protection. Although the distinction between protected and unprotected expression will sometimes be subtle, it is no more so than other distinctions triers of fact are called on to make in First Amendment jurisprudence. (See, e.g., *Miller v. California* (1973) 413 U.S. 15, 24 [93 S.Ct. 2607, 2615, 37 L.Ed.2d 419] [requiring determination, in the context of work alleged to be obscene, of "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value"].)

Turning to Saderup's work, we can discern no significant transformative or creative contribution. His undeniable skill is manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame. Indeed, were we to decide that Saderup's depictions were protected by the First Amendment, we cannot perceive how the right of publicity would remain a viable right other than in cases of falsified celebrity endorsements.

Moreover, the marketability and economic value of Saderup's work derives primarily from the fame of the celebrities depicted. While that fact alone does not necessarily mean the work receives no First Amendment protection, we can perceive no transformative elements in Saderup's works that would require such protection.

Saderup argues that it would be incongruous and unjust to protect parodies and other distortions of celebrity figures but not wholesome, reverential portraits of such celebrities. The test we articulate today, however, does not express a value judgment or preference for one type of depiction over another. Rather, it reflects a recognition that the Legislature has granted to the heirs and assigns of celebrities the property right to exploit the celebrities' images, and that certain forms of expressive activity protected by the First Amendment fall outside the boundaries of that right. Stated another way, we are concerned not with whether conventional celebrity images

---

[12]The novelist Don DeLillo gives this fictional account of an encounter with Warhol's reproductions of images of Mao Zedong: "He moved along and stood finally in a room filled with images of Chairman Mao. Photocopy Mao, silk-screen Mao, wallpaper Mao, synthetic-polymer Mao. A series of silk screens was installed over a broader surface of wallpaper serigraphs, the Chairman's face a pansy purple here, floating nearly free of its photographic source. Work that was unwitting of history appealed to [him]. He found it liberating. Had he ever realized the deeper meaning of Mao before he saw these pictures?" (DeLillo, Mao II (1991) p. 21.)

should be produced but with who produces them and, more pertinently, who appropriates the value from their production. Thus, under section 990, if Saderup wishes to continue to depict The Three Stooges as he has done, he may do so only with the consent of the right of publicity holder.

## IV. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

## APPENDIX