Thomas **HOEPKER** a/k/a Thomas Hopker and Charlotte Dabney, Plaintiffs,

v.

Barbara **KRUGER**, Whitney Museum of American Art, Museum of Contemporary Art L.A., Paula Goldman, M.I.T. Press, a department of Massachusetts Institute of Technology, Mary Boone, d/b/a Mary Boone Gallery, Educational Broadcasting Systems d/b/a Public Service Television Thirteen Wnet, d/b/a American Visions, Defendants.

No. 00 CIV. 6619(AKH).

United States District Court, S.D. New York.

May 3, 2002.

Stephen A. Weingrad, Weingrad & Weingrad, LLP, New York City, for Plaintiffs.

**342**

Robert W. Clarida, Cowan, Liebowitz & Latman, P.C., New York City, for Barbara Kruger, Mary Boone, Public Service Television Thirteen WNET.

Peter Herbert, Lankler, Siffert & Wohl, LLP, New York City, for Whitney Museum of American Art.

Michael H. Bierman, Ian M. Wallach, Mitchell L. Lathrop, Luce, Forward, Hamilton & Scripps, LLP, New York City, for Museum of Contemporary Art L.A., M.I.T. Press.

### OPINION AND ORDER

HELLERSTEIN, District Judge.

This right of privacy case is before the Court on defendants' motion to dismiss the Amended Complaint, on the ground that plaintiff Dabney has failed to state a claim upon which relief can be granted, and on the ground that plaintiff has not alleged a sufficient jurisdictional amount to support diversity jurisdiction. Defendants have also moved for an order awarding costs and fees against plaintiffs for an earlier stage of the proceedings. For the reasons discussed below, I grant defendants' motion dismissing the Amended Complaint, and deny their motion for costs and fees.

### FACTUAL BACKGROUND

Plaintiff Thomas Hoepker is a well-known German photographer. In 1960, during the early days of his career, Hoepker created a photographic image of plaintiff Charlotte Dabney. The image, "Charlotte As Seen By Thomas," pictures Dabney from the waist up, holding a large magnifying glass over her right eye. Dab-

ney's eye fills the lens of the magnifying glass, and the lens covers a large portion of Dabney's face. The image was published once in the German photography magazine *FOTO PRISMA* in 1960.

Defendant Barbara Kruger also is a well-known artist, specializing in collage works combining photographs and text. In 1990, Kruger created an untitled work incorporating Hoepker's "Charlotte As Seen By Thomas." To create her work (the "Kruger Composite"), Kruger cropped and enlarged Hoepker's photographic image, transferred it to silkscreen and, in her characteristic style, superimposed three large red blocks containing words that can be read together as, "It's a small world but not if you have to clean it."

In April of 1990, Kruger sold the Kruger Composite to defendant Museum of Contemporary Art L.A. ("MOCA"). MOCA thus acquired the right to display the Kruger Composite without violating Kruger's copyright by virtue of 17 U.S.C. § 109(c)[1] and, by separate license, acquired a non-exclusive right to reproduce the work. From October 17, 1999 to February 13, 2000, MOCA displayed the Kruger Composite as one of sixty-four works of art in an exhibit dedicated to Kruger (the "Kruger Exhibit"). In conjunction with the exhibition, MOCA sold gift items in its museum shop featuring the Kruger Composite in the form of postcards, note cubes, magnets and t-shirts. MOCA also sold a book respecting Kruger's works and ideas entitled "Barbara Kruger" (the "Kruger Catalog") that was published jointly with defendant M.I.T. Press. The Kruger Catalog contains three depictions of the

---

**1.** Section 109(c) of the Copyright Act provides that "... the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to dis- play that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located."

Kruger Composite among the hundreds of pictures in the 200–plus page book.

MOCA's gross proceeds from sales of the gift items (except the t-shirts) were $12,020, with net revenues (proceeds minus cost of goods) of $7,485. Revenues from t-shirt sales apparently were less than $7,300. MOCA's gross proceeds from sales of the Kruger Catalog were approximately $236,950, with approximately $53,644 in net revenues (proceeds minus printing costs). M.I.T. Press claims $134,323 in gross proceeds and $39,084 in net revenues (proceeds minus acquisition costs and direct support costs) in connection with its own sales of the Kruger Catalog.

After closing in Los Angeles, the Kruger Exhibit traveled to New York and was presented at defendant Whitney Museum of American Art (the "Whitney") from July 13 through October 22, 2000. The Whitney advertised the Kruger Exhibit in various ways, including newsletters and brochures that incorporated the Kruger Composite. The Whitney also purchased from MOCA an inventory of the Kruger Catalog and various gift items to sell at its museum shop in conjunction with the exhibition.[2] The Whitney's approximate profits from sales of the Kruger Catalog were less than $37,000, and profits from its sales of gift items were less than $800.

Around the time the Whitney presented the Kruger Exhibit, reproductions of the Kruger Composite appeared as five-story-high "billboard art"[3] at one or more locations in Manhattan. The Amended Complaint alleges that these billboard installments were commissioned by the Whitney to advertise the Kruger exhibition. The Whitney denies that it paid for the bill-

boards or that the billboards were used to advertise its exhibit, but admits (at least it is evidenced from the Whitney's submissions) that the "Barbara Kruger: Big Picture" billboards were an art project "co-produc[ed]" by "the Public Art Fund and the Whitney Museum of American Art, with additional support from MegaArt," and that the Whitney's name, along with Kruger's and the other sponsors' names, appeared at the bottom of the billboards in comparatively small font. Presumably, by denying that the billboards were advertisements, the Whitney contends they were instead art.

Defendant Education Broadcasting Systems ("EBS") maintained a now-retired website entitled "American Visions" at <www.thirteen.org/americanvisions>. From approximately June 1997 through mid-December 2000, the American Visions virtual "gallery" included a reproduction of the Kruger Composite in its digital collection of contemporary American art. The credit line below the digital reproduction stated that the image was "[c]ourtesy of Mary Boone Gallery, New York," and submissions by EBS confirm that the use was licensed by the gallery.

Defendant Mary Boone d/b/a Mary Boone Gallery ("Boone") is, according to materials supplied by defendants, Kruger's dealer and acts as Kruger's agent for granting permission to display or reproduce Kruger's works. Plaintiffs allege that Boone "promot[ed], assist[ed] and enabl[ed] the sale" of the Kruger Composite to MOCA, and "willfully remov[ed] [Hoepker's] copyright management information and s[old] the image with the false designation of origin." Kruger's affidavit denied that Boone was involved in the sale

---

2. MOCA's revenue figures include its sales of merchandise to the Whitney for resale.

3. The "billboard art" consisted of a reproduction of the Kruger Composite on a large vinyl sheet affixed to the sides of buildings.

to MOCA, but, as will appear from the discussion below, this issue of fact is not material in light of my disposition.

The final defendant, Paula Goldman, allegedly "falsely claim[ed] authorship to the photograph and willfully remov[ed] Hoepker's copyright management information from his original published image and then willfully provid[ed] a false designation of origin." Amended Compl. ¶ 8. In other words, plaintiffs seem to be alleging that Goldman took credit as the originator of the photograph used in the Kruger Composite. Like Boone, the issue of fact is not material.

## PROCEDURAL BACKGROUND

Hoepker and Dabney filed suit in September 2000, alleging copyright infringement and unfair competition as to Hoepker's photographic image, and violation of Dabney's right of privacy. In April 2001, defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. On July 26, 2001, after reviewing the parties' papers and hearing oral argument, I granted defendants' motion to dismiss the copyright claim and granted plaintiff Dabney opportunity to replead the right of privacy claim,[4] and reflected my decision in a written summary order dated and filed July 30, 2001. Plaintiff Hoepker subsequently moved for reconsideration of the July 26 order, a motion I denied by order of August 28, 2001.

Following dismissal of the copyright claims, defendants moved for an order pursuant to Rule 54(d) awarding them fees and costs. By memo endorsement of August 20, 2001, I ordered the issue deferred.

Plaintiffs filed an Amended Complaint on August 14, 2001. Defendants now move to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue that Dabney failed to satisfy the amount-in-controversy requirement for diversity jurisdiction, and that the First Amendment bars Dabney's right of privacy claim.

During the course of these proceedings, the parties have submitted, and I have accepted and considered, affidavits and other submissions addressing factual matters outside the pleadings. Therefore, pursuant to Fed. R. Civ. Proc. 12(b), I treat the defendants' motion for failure to state a claim as a motion for summary judgment under Fed. R. Civ. Proc. 56. The parties, by their several submissions, have presented all material pertinent to the legal and factual sufficiency of plaintiff's claims.

For the reasons stated below, I grant to defendants summary judgment dismissing the Amended Complaint, and deny them attorneys' fees and costs. I also now write to reflect my previous rulings dismissing Hoepker's copyright claim, made from the bench on July 26, 2001 and reaffirmed by written order of August 28, 2001. Hoepker's claim of copyright infringement raises important and complicated, but rarely explicated, provisions of the Copyright Act, and a written opinion may therefore be useful.

## DISCUSSION

### I. Infringement of Hoepker's Copyright

#### A. Status of Hoepker's Copyright

██ Hoepker, a German photographer, first published "Charlotte As Seen By

---

4. At oral argument, plaintiffs voluntarily withdrew the unfair competition claim. Since this claim was only claim that could be al-

leged against defendant Paula Goldman, she is dismissed from the action.

Thomas" in Germany in 1960. Pursuant to the Uniform Copyright Convention ("U.C.C."), to which both the United States and Germany are signatories,

> Published works of nationals of any Contracting State and works first published in that State shall enjoy in each other Contracting State the same protection as that other State accords to works of its nationals first published in its own territory.

U.C.C. Article II(1). Accordingly, as I ruled in my August 28 Order, "Hoepker's work published in Germany was given 'in [the United States] the same protection as [the United States] accords to works of its nationals first published in its own territory.' U.C.C. Art. II(1). Thus, in 1960, when Hoepker gained a German copyright, he simultaneously gained a copyright in the United States."

Under the terms of the U.C.C., Hoepker's copyright protection in the United States is governed by United States copyright laws. The laws in effect in 1960 afforded an initial copyright term of 28 years, subject to renewal at the end of the 28–year period for another 28 years. In Hoepker's case, his initial copyright term lasted from 1960 to 1988. Because Hoepker failed to renew protection as required by then-applicable United States law, his copyright terminated after this initial term. Thus, in 1988, "Charlotte As Seen by Thomas" fell into the public domain in the United States, and Kruger thereafter was free to incorporate the photographic image into her own work, as she did in 1990.

In 1994, six years after Hoepker's United States copyright expired and four years after Kruger created the Kruger Composite, Congress amended the Copyright Act to restore copyright protection to works of foreign origin that had entered the public domain in the United States for failure to comply with certain formal requirements of United States copyright law. Section 104A of the Copyright Act, 17 U.S.C. § 104A, effectuates the restoration.

Section 104(h)(6) defines a "restored work" as "an original work of authorship that ... is not in the public domain in its source country ... [but] is in the public domain in the United States." 17 U.S.C. § 104A(h)(6). "Charlotte As Seen By Thomas" qualifies as a restored work. When Hoepker's photographic image was first published in Germany in 1960, German law provided a copyright term of 25 years. The German law subsequently was revised to afford protection enduring for the life of the author plus seventy years. Since Hoepker's copyright is still extant in Germany, but had fallen into the public domain in the United States, his United States copyright was restored by virtue of Section 104A as of January 1, 1996. *See* 17 U.S.C. §§ 104A(a)(1)(A) & 104A(h)(2)(A) (Germany qualifies under this subsection). Hoepker's term of restored United States copyright endures through 2055, a period of 95 years as provided under the relevant statutes. *See* 17 U.S.C. §§ 104A(a)(1)(B) & 304.

**B. Actions for Restored Copyrights**

Recognizing that restoring copyright to works thought to be in the public domain could be problematic to those who had relied on the public domain status, Congress was careful to limit the restoration statute's potential for unanticipated infringement claims. First, the section provides a remedy only for infringing acts that occur after a copyright has been restored. *See* 17 U.S.C. § 104A(d)(1)-(2). More importantly, Section 104A provides safeguards to "reliance parties." A reliance party is a person or entity who

> engage[d] in acts before the source country of that work became an eligible

country[5] which would have violated [the rights of an author of a restored work] if the restored work had been subject to copyright protection, and who, after the source country becomes an eligible country, continues to engage in such acts ...; or ... as the result of the sale or other disposition of [an existing] derivative work ... is a successor, assignee or licensee of that person.

17 U.S.C. § 104A(h)(4). Infringement actions against reliance parties can be commenced (1) only after the restored copyright owner has provided notice of intent to enforce the restored copyright (either by filing a notice with the Copyright Office for publication in the Federal Register or by serving such a notice on the reliance party)[6] and (2) only for those acts of infringement that either commence or continue 12 months or more after such notice is given.[7] *See* 17 U.S.C. § 104A(d)(2)(A)-(B).

Once notice is given and the grace period expires, Section 104A(d)(2) gives restored copyright holders full access to copyright remedies—except when the act of infringement is based on an "existing derivative work."[8] The only remedy for the "exploit[ation]" of an existing deriva-

tive work is the payment of "reasonable compensation for [the would-be infringing] conduct." 17 U.S.C. § 104A(d)(3). In other words, a person who created a new work of art by borrowing from a work then in the public domain but now protected by virtue of Section 104A restoration cannot be prohibited from exploiting that independent creation, but can be required to pay a licensing-type fee.[9]

### C. Application

As explained on the record on July 26, 2001 and reiterated in my August 28, 2001 order, Hoepker has no cause of action for any infringement of "Charlotte, As Seen By Thomas" occurring between 1988 and 1994. At that time, his photographic image was in the public domain in the United States, and Section 104A restores copyright only for prospective acts of infringement. 17 U.S.C. § 104A(d)(1)-(2).

As for alleged acts of infringement occurring after the restoration of Hoepker's copyright, Kruger clearly is a reliance party. By creating the Kruger Composite in 1990, Kruger engaged in an act which would have violated Hoepker's copyright—specifically, his exclusive right to create

---

5. December 8, 1994 is the relevant date for this case. Germany became an "eligible country" on the date the Uruguay Round Agreements Act was enacted in the United States (December 8, 1994) because Germany was a Berne Convention adherent nation as of that date. *See* 17 U.S.C. §§ 104A(h)(4)(A) & 104A(h)(3).

6. Subsection (e) of Section 104A provides the formal requirements for both types of notice.

7. Where the act of infringement consists merely of reproducing the restored work, the 12–month grace period does not apply. *See* 17 U.S.C. §§ 104A(d)(2)(A)(ii)(III) and 104A(d)(2)(B)(ii)(III).

8. An "existing derivative work" is "a derivative work that is based upon a restored work and is created—(i) before the date of the en-

actment of the Uruguay Round Agreements Act [December 8, 1994], if the source country of the restored work is an eligible country on such date, or (ii) before the date on which the source country of the restored work becomes an eligible country, if that country is not an eligible country on such date of enactment." 17 U.S.C. § 104A(d)(3)(A).

9. Subsection (d)(3)(a) supposes that the existing derivative work owner and the restored copyright owner can agree on reasonable compensation. Where the parties are not able to arrive at a mutually acceptable agreement, either party, under subsection (d)(3)(b), may seek assistance from a district court to set an appropriate compensation fee.

derivative works [10]—if Hoepker's photographic image had been subject to copyright protection at that time. According to the allegations of the complaint, she continued to engage in infringing acts post-restoration. Hence, she satisfies the requirements of a reliance party as set forth in 17 U.S.C. § 104(h)(4)(A). MOCA, too, is clearly a reliance party; having purchased the Kruger Composite, MOCA is, for some purposes, a successor to and, for other purposes, a licensee of Kruger.[11] 17 U.S.C. § 104(h)(4)(B).

As reliance parties, Kruger and MOCA may engage in acts that infringe Hoepker's restored work until, and for twelve months after, Hoepker gives them formal notice, as required by subsections (d)(2)(A) and (d)(2)(B) and as specified in subsections (e)(1) and (e)(2). Hoepker never gave the requisite notice, neither filing a notice of intent with the Copyright Office nor serving such a notice on Kruger or MOCA. Therefore, at this time, Hoepker may not seek redress for any alleged acts of infringement by these parties.[12]

The "exploi[tation]" language of subsection (d)(3) equally precludes Hoepker's current cause of action against the Whitney, M.I.T. Press and EBS. Although not defined anywhere in the Copyright Act, "exploit[ation]" of a work of art at the very least must include the right to license that work to others for display (in the case of the Whitney and EBS) and reproduction (in the case of M.I.T. Press). Arguably, "exploit[ation]" might also include the right to create new derivative works from the existing derivative work (such as MOCA's creation of the museum gift merchandise)—but, because Hoepker's claims against MOCA are precluded by his failure to give notice, Hoepker is unable to complain about these uses at this time.

Accordingly, I confirm my prior oral and written decisions dismissing Hoepker's copyright claims.

## II. Violation of Dabney's Right to Privacy

■ Plaintiff Dabney has alleged violation of her right of privacy based on defendants' various activities. In the Amended Complaint, Dabney states that the defendants' actions violate New York's right of privacy laws "and others," but does not specify what other states' laws might apply. In the original Complaint, Dabney asserted that she might have a claim under California law, but would not know until completion of discovery. At oral argument on July 21, 2001, I dismissed the possible California claim, instructing plaintiff either to assert a definite claim under California's privacy laws in the Amended Complaint or to leave it out completely. Rather than complying with this instruction, Dabney again waffled as to whether she has a

---

**10.** Hoepker argues that the Kruger Composite is not a derivative work because it lacks sufficient additional creative elements. This argument is without merit, and cannot be the basis for allowing plaintiff to dispense with notice, as if the Kruger Composite were nothing more than a mere "reproduction." *See* n. 7.

**11.** By virtue of ownership of the Kruger Composite, MOCA has the right to display it, even without permission from Kruger, the copyright owner. 17 U.S.C. § 109(c). Kruger separately gave MOCA a license to reproduce copies of the Kruger Composite on merchandise to be sold at MOCA's gift shop and at wholesale to other institutions.

**12.** Even had Hoepker given the necessary notice to Kruger and/or MOCA, Hoepker's potential claims against these entities would have been limited by Section 104A(d)(3). The Kruger Composite is an "existing derivative work" as defined in that subsection, and therefore the only remedy Hoepker may seek based on "exploi[tation]" of that work is "reasonable compensation."

claim under California law, invoking New York's right of privacy laws "and others" without specifying which other states or other laws were relevant. A complaint must give defendants—and the court—reasonable notice of the claims asserted. *See* Fed.R.Civ.P. 8; *cf. Pittera v. Parade Publications, Inc.,* 30 Misc.2d 706, 219 N.Y.S.2d 998, 1000 (N.Y.Sup.Ct.1961), *modif'd on other grounds,* 15 A.D.2d 882, 225 N.Y.S.2d 478 (N.Y.A.D.1962). The Amended Complaint specifies only New York law, and this is, accordingly, the only law I will consider. Plaintiff's oblique reference to other states' laws is stricken.

The right of privacy in New York is derived solely from statute. *Groden v. Random House, Inc.,* 61 F.3d 1045, 1048–49 (2d Cir.1995). The two relevant statutes are Sections 50 and 51 of New York Civil Rights Law.[13] To succeed on right of privacy claim, a plaintiff must prove (1) use of plaintiff's name, portrait, picture or voice (2) "for advertising purposes or for the purposes of trade" (3) without consent and (4) within the state of New York.[14] *Titan Sports, Inc. v. Comics World Corp.,* 870 F.2d 85, 87 (2d Cir.1989). There is no debate that at least some of the defendants used plaintiff's picture (as incorporated in the Kruger Composite) without her consent in the state of New York. The only

question is whether the defendants' various uses of Dabney's picture were "for advertising purposes or for purposes of trade," as those terms are limited by New York and constitutional case law.

The advertising and trade limitation in New York's privacy statutes was crafted with the First Amendment in mind. Through Sections 50 and 51, the New York legislature sought to protect a person's right to be free from unwarranted intrusions into his or her privacy, while at the same time protecting the quintessential American right to freedom of expression. *See Waters v. Moore,* 70 Misc.2d 372, 334 N.Y.S.2d 428, 434 (N.Y.Sup.Ct.1972); *Rubino v. Slaughter,* 136 N.Y.S.2d 873, 874 (N.Y.Sup.Ct.1954). While First Amendment concerns do come into play, "the rights guaranteed by the First Amendment do not require total abrogation of the right to privacy," *Briscoe v. Reader's Digest Ass'n, Inc.,* 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34, 42 (1971), and a careful weighing of interests, on a case by case basis, is therefore necessary. The balance struck in the privacy laws and in their application is consistent with First Amendment jurisprudence, for government may encumber or restrict commercial speech more readily than "pure" First Amend-

**13.** Section 50 provides, "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." N.Y. Civ. Rts. § 50. As a penal statute, Section 50 is not relevant to the current cause of action.

Section 51 provides, "Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without . . . written consent first obtained . . . may maintain an equitable action in the supreme court of this state against the person, firm or corporation so

using this name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages." N.Y. Civ. Rts. § 51.

**14.** Although Dabney is not a resident of New York, nonresidents may bring actions under Section 51. *Pierrottie v. Dell Publications Co.,* 199 F.Supp. 686, 688 (D.C.N.Y.1961) (citing cases holding that statute is not limited to N.Y. residents).

ment expression such as political discourse. *See Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

In the end, free speech rights clearly transcend privacy rights when the speech concerns "newsworthy events or matters of public interest." *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 224–25, 474 N.E.2d 580 (1984) (use of plaintiff's photograph in connection with an article of public interest held not to be the kind of use prohibited by the statute and held to fall within the statute's First Amendment "exception [that] reflects Federal and State constitutional concerns for free dissemination of news and other matters of interest to the public"); *see also Arrington v. New York Times Co.*, 55 N.Y.2d 433, 440, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982). When other types of speech are at issue, most notably when the speech is in the form of art, the application of the First Amendment exception to the right of privacy statute is less clear cut.

New York courts have taken the position in the right of privacy context that art is speech, and, accordingly, that art is entitled to First Amendment protection vis-à-vis the right of privacy. In *Simeonov v. Tiegs*, 159 Misc.2d 54, 602 N.Y.S.2d 1014 (N.Y.City Civ.Ct.1993), for example, Cheryl Tiegs, a well-known model, sought to prevent a sculptor from creating 20 bronze busts of her likeness to be sold for $20,000 each. The court determined that the bronze sculptures were protected expression under the First Amendment and that Tiegs' right of privacy claim must fail. The court held that "[a]n artist may make a work of art that includes a recognizable likeness of a person without her or his written consent and sell at least a limited number of copies thereof without violating

[Sections 50—51].... Although a person's right of privacy as protected by Civil Rights Law sections 50 and 51 is also a very significant right, it must fall to the constitutionally protected right of freedom of speech." 602 N.Y.S.2d at 1018.

The California courts recently took a slightly different position on the issue in *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 106 Cal. Rptr.2d 126, 21 P.3d 797 (2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 806, 151 L.Ed.2d 692 (2002), determining that only sufficiently "transformative" art was entitled to First Amendment protection against right of publicity claims. The California Supreme Court reasoned that,

> [w]hen artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond the trespass, the state law interest in protecting the fruits of artistic labor outweighs the expansive interest of the imitative artist.... On the other hand, when a work contains significantly transformative elements, it is not only especially worthy of First Amendment protection, but is also less likely to interfere with the economic interest protected by the right of publicity.... Accordingly, First Amendment protection of such works outweighs whatever interest the State may have in enforcing the right of publicity.

106 Cal.Rptr.2d 126, 21 P.3d at 808 (footnotes and internal citations omitted). The test in *Comedy III* seems to be whether it is the art, or the celebrity, that is being sold or displayed. *See* 106 Cal.Rptr.2d 126, 21 P.3d at 809 (stating that the central inquiry for determining if a work is "transformative" is "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or

whether the depiction or imitation of the celebrity is the very sum and substance of the work in question").

Regardless whether I use the New York standard as applied in cases like *Simeonov*, or adopt the "transformative" requirement from the California courts, the Kruger Composite should be shielded from Dabney's right of privacy claim by the First Amendment. The Kruger Composite itself is pure First Amendment speech in the form of artistic expression (with sufficiently transformative elements to satisfy *Comedy III*) and deserves full protection, even against Dabney's statutorily-protected privacy interests. *See Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir.1996) ("Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to a full First Amendment protection."). Therefore, the Whitney's display of the Kruger Composite and EBS's display of a digital reproduction of the Kruger Composite in its virtual gallery fall within the scope of the First Amendment and outside the range of Sections 50 and 51. *See Simeonov, supra; cf. Costanza v. Seinfeld*, 279 A.D.2d 255, 719 N.Y.S.2d 29, 30 (1st Dep't 2001) (use of plaintiff's name in work of fiction was not use for trade or advertising purposes within meaning of statute).

Similarly, the reproduction of the Kruger Composite in the Exhibit Catalog is pure speech, made to further discussion and commentary on Kruger and her body of work.[15] *Univ. of Notre Dame Du Lac v. Twentieth Century–Fox*, 22 A.D.2d 452, 256 N.Y.S.2d 301, 304 (1st Dep't) (Books "are 'a significant medium for the communication of ideas;' their importance 'as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as inform.' ") (*quoting Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), and citing *Jacobellis v. State of Ohio*, 378 U.S. 184, 187, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)), *aff'd*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965).

■ Certain other uses complained of by plaintiff are also clearly exempt from Dabney's right of privacy action under the "ancillary use" exception created by New York courts.[16] While the privacy laws prohibit nonconsensual use of a person's image for advertising purposes, advertising that is undertaken in connection with a use protected by the First Amendment falls outside the statute's reach. The ancillary use exception gives news agencies, magazine publishers, etc. the ability to publicize their newsworthy articles without violating the right of privacy statutes. *Stern v. Delphi Internet Services Corp.*, 165 Misc.2d 21, 626 N.Y.S.2d 694, 700 (N.Y.Sup.Ct.1995). For example, the exception protects the use of a person's name and picture in a newspaper advertisement

---

**15.** Even were the Kruger Catalog not exempt as pure speech, the use of Dabney's image in three pictures among hundreds in the book might be exempt under the "fleeting use" exception to the "right of privacy, which protects the writers and publishers of books and other materials from liability for 'isolated,' 'fleeting,' or 'de minimis' uses of a person's name or image." *Netzer v. Continuity Graphic Associates, Inc.*, 963 F.Supp. 1308, 1326 (S.D.N.Y.1997) (use of plaintiff's name as fictional character's alias in one panel out of 116 in 24–page comic book was isolated and did not violate plaintiff's right of publicity); *see also Univ. of Notre Dame Du Lac v. Twentieth Century–Fox*, 22 A.D.2d 452, 256 N.Y.S.2d 301, 304 (1st Dep't) (mentioning plaintiff three times in 143–page book did not violate right of privacy), *aff'd*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965).

**16.** The "ancillary use" exception is better known as the "incidental use" exception.

announcing an article about that person. *See Sidis v. F–R Pub. Corp.,* 113 F.2d 806 (2d Cir.1940); *see also Groden,* 61 F.3d 1045 (defendant did not violate plaintiff's right of privacy by using plaintiff's name and picture in advertisements for book in which plaintiff's work is discussed); *Namath v. Sports Illustrated,* 48 A.D.2d 487, 371 N.Y.S.2d 10, 11–12 (1st Dep't 1975) (publisher could use plaintiff's picture to solicit subscriptions where photograph indicated content of defendant's magazine); *Friedan v. Friedan,* 414 F.Supp. 77 (D.C.N.Y.1976) (use of plaintiff's photograph on television commercials advertising magazine issue featuring article on plaintiff was not actionable).

Although the ancillary use exception was first developed in the context of advertisements for books and periodicals, it applies equally well here to advertising undertaken by the Whitney to promote the Kruger Exhibit. As discussed above, the Kruger Exhibit is pure First Amendment speech outside the proscription of Sections 50 and 51. While the brochures and newsletter distributed by the Whitney to promote the Kruger Exhibit may have been used for advertising purposes—specifically, to increase patronage of the museum and the exhibit—that use was related to the protected exhibition of the Kruger Composite itself. The brochures, newsletters and other advertisements merely " 'prove[d] the worth and illustrate[d][the] content' " of the Kruger Exhibit and the Whitney itself, *Groden,* 61 F.3d at 1049 (quoting *Booth v. Curtis Publ'g Co.,* 15 A.D.2d 343, 223 N.Y.S.2d 737, 743 (1st Dep't), *aff'd,* 11 N.Y.2d 907, 228 N.Y.S.2d 468, 182 N.E.2d 812 (1962)), and are therefore immune from Dabney's right of privacy claim.

The billboard art reproduction of the Kruger Composite is also protected against Dabney's right of privacy claim. Whether the billboard art reproduction is "pure" First Amendment speech as the Whitney claims, or an advertisement of the Kruger Exhibit as Dabney claims, it falls outside the sphere of activity prohibited by New York's privacy statutes for the reasons discussed above.

■ Whether the remaining uses complained of—the use of Dabney's image on the museum gift shop items sold by the Whitney and MOCA [17]—fall with the privacy statute's ambit is a more complicated question. The museums argue that the gift merchandise is protected First Amendment expression as clearly as the Kruger Composite itself, in that the gift items are merely reproductions of the Kruger Composite in a medium better able to "disseminat[e] [the] protected visual expression for public enjoyment," carrying the message of the original artwork to a broader class of people than could afford to own the original artwork and to a larger number of people than would otherwise have a chance to view the Kruger Composite itself. Dabney, on the other hand, argues that the museums' First Amendment arguments are merely subterfuge, that Dabney's image was emblazoned on gift trinkets solely to promote sales of those trinkets. *See Lane v. F.W. Woolworth Co.,* 171 Misc. 66, 11 N.Y.S.2d 199 (N.Y.Sup.) (use of actress's picture in locket to make lockets more attractive to potential consumers was for purposes of trade), *aff'd,* 256 A.D. 1065, 12 N.Y.S.2d 352 (1st Dep't 1939); *cf. Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 581, 97 S.Ct. 2849, 53 L.Ed.2d

---

**17.** Although MOCA's sales of gift items in its own museum shops in California are exempt from New York's right of privacy laws as not having occurred in New York, MOCA's sale of gift items to the Whitney in New York for resale does fall within the reach of New York's privacy laws.

965 (1977) (Powell, J., dissenting) (First Amendment does not protect "a subterfuge or cover for private or commercial exploitation").

Case law makes clear that the sale for profit of an item bearing a person's name or likeness does not entirely determine whether use of that person's name or likeness is for trade or advertising purposes within the meaning of the statute. *See Simeonov*, 602 N.Y.S.2d at 1018 ("Part of the protection of free speech ... is the right to disseminate the 'speech,' and that includes selling it.") (*quoting Time, Inc. v. Hill*, 385 U.S. 374, 397, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)); *see also Guglielmi v. Spelling–Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454, 459–60 (1979) ("The First Amendment is not limited to those who publish without charge."); *cf. Riley v. National Federation of Blind of North Carolina*, 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."); *Bery v. New York City*, 97 F.3d 689 (2d Cir.1996) ("The sale of protected materials [under the First Amendment] is also protected.").

Rather than focusing on the motive of the person creating the work at issue, New York state courts deciding Section 51 cases have focused on the underlying nature of the work itself. *See, e.g., Simeonov*, 602 N.Y.S.2d at 1018; *Stephano*, 485 N.Y.S.2d at 225, 474 N.E.2d 580 ("It is the content of the article and not the defendant's motive or primary motive to increase circulation which determines whether it is a newsworthy item, as opposed to a trade usage, under [Section 51]"). But using such a test invites judges to decide what constitutes art or expression—and what does not—thus asking them to make draw

potentially artificial lines. For example, *Simeonov* held that a bronze bust did not violate the model's right to privacy, but suggested that a mere mannequin might. *See Simeonov*, 602 N.Y.S.2d at 1017, *distinguishing and approving Young v. Greneker Studios, Inc.*, 175 Misc. 1027, 26 N.Y.S.2d 357 (N.Y. City Sup.Ct.1941). And a dissenting judge in the California Supreme Court suggested that "the sale of such objects as plastic toy pencil sharpeners, soap products, target games, candy dispensers and beverage stirring rods [emblazoned with Lugosi–as–Dracula likenesses]... hardly implicates the First Amendment." *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 851, 160 Cal.Rptr. 323, 603 P.2d 425 (1979) (Byrd, C.J., dissenting).

Yet, mannequins and pencil sharpeners and other such products can also qualify as art, and museums sometimes collect and display them as such. And case law makes clear that "First Amendment doctrine does not disfavor nontraditional media of expression." *Comedy III Productions*, 106 Cal.Rptr.2d 126, 21 P.3d at 804; *see also Cardtoons, L.C. v. Major League Baseball Players Association*, 95 F.3d 959 (10th Cir.1996) (trading cards containing caricatures of baseball players provided social commentary, and therefore were entitled to First Amendment protection); *cf. Ayres v. City of Chicago*, 125 F.3d 1010, 1017 (7th Cir.1997) (defendant's t-shirts, which advocated the legalization of marijuana, "are to [the seller] what the New York Times is to the Sulzbergers and the Ochses—the vehicle of her ideas and opinions."). Courts should not be asked to draw arbitrary lines between what may be art and what may be prosaic as the touchstone of First Amendment protection.

The test advocated by the Second Circuit in *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85 (2d Cir.1989), avoids the type of line drawing invited by the *Simeo-*

*nov* test and provides a more useful framework. In *Titan Sports,* defendants Comics World Corp., Starlog Group, Inc. and O'Quinn Studios, Inc. published magazines dedicated to professional wrestling. The publishers included in their magazines large (roughly 16″x22″) photographic inserts, known as "magazine posters," of popular professional wrestling stars. On cross-motions for summary judgment, the trial court held for defendants, concluding that the posters were related to the publications' subject matter and therefore were not included in the magazines for either advertising or independent trade purposes. *See Titan Sports, Inc. v. Comics World Corp.,* 690 F.Supp. 1315 (S.D.N.Y.1988). The Court of Appeals for the Second Circuit reversed, citing the need for factual development. Stating that "New York courts have recognized that an insignificant public interest aspect of a 'publication' cannot exempt it from the reach of section 51 where the primary aspect of the product is commercial," the Court instructed the trial court to "consider whether the[ ] [magazine posters were] included primarily for their 'public interest aspect' or whether whatever public interest aspect might be involved '[was] merely incidental to [the publishers'] commercial purpose.'" 870 F.2d at 87, 88–89 (*quoting Davis v. High Society Magazine, Inc.,* 90 A.D.2d 374, 457 N.Y.S.2d 308, 313 (2d Dep't 1982)).

A similar test was utilized in an earlier state court case, *Quezada by De Lamota v. Daily News,* 125 Misc.2d 302, 479 N.Y.S.2d 682, 685 (N.Y.City Civ.Ct.1984), which held that "[a] use [is] one for advertising or trade where there is no real relationship between the use and the newsworthy article." *See also Stephano,* 485 N.Y.S.2d at 225, 474 N.E.2d 580 (photograph accompanying an article concerning a matter of public interest may still be considered a use for the purposes of trade if "it has no

real relationship to the article"); *ETW Corp. v. Jireh Publ'g, Inc.,* 99 F.Supp.2d 829 (N.D.Ohio 2000) (print of Tiger Woods at golf tournament did not violate his right of publicity; court held that "not all posters are the equivalent of merchandise" and that "defendant's artistic prints seek[ ] to convey a message [are] distinguished from posters which merely reproduce an existing photograph") (currently on appeal).

Although developed in the context of the "newsworthiness" exception for media uses of names and photographs, the test advocated by the Second Circuit in *Titan Sports* and the New York state court in *Quezada* can be applied to the instant case as well. Here, Dabney's image was affixed to various gift items not to flaunt her visage, but because the gift items reproduced the Kruger Composite, a work of art displayed by the Whitney in its museum galleries. Borrowing language from the California Supreme Court, "[Dabney's] likeness appeared in the [gift merchandise] for *precisely* the same reason [it] appeared on the original [Kruger Composite]," *Montana v. San Jose Mercury News, Inc.,* 34 Cal.App.4th 790, 794, 40 Cal.Rptr.2d 639 (1995) (emphasis in original). Viewed in this light, it is easy to distinguish this case from the facts presented in *Titan Sports.* Here, the museums are selling art, albeit on t-shirts and refrigerator magnets, whereas the *Titan Sports* defendants were selling nothing more than the wrestlers' images.

My holding, in the context of a museum store selling items reflecting art displayed in its galleries, should not be interpreted as conflating "the right to speak" into "the right to manufacture in bulk." *See* Jane Graines, *Contested Culture: The Image, the Voice and the Law* (1991) (*quoted in* Jane C. Ginsburg, *Exploiting the Artist's Commercial Identity: The Merchandizing of Art Images,* 19 Colum.-VLA J.L. &

ARTS 1 (1994/1995)). Museum gift shops sell merchandise that, in general, replicates the art displayed in the museum, thus enabling the museum to distribute art in a common and ordinary form that can be appreciated in everyday life. That the art is reproduced in formats and in quantities sold for modest sums makes the art popular, but does not change the essential nature of the artistic expression that is entitled to First Amendment protection.

In sum, none of the uses of Dabney's image, as incorporated in the Kruger Composite, complained of by plaintiff are actionable under New York's right of privacy statute. Plaintiff has failed to state a legally sufficient claim for right of privacy violation and the Amended Complaint must therefore be dismissed.

### III. Jurisdictional Amount

■ Defendants also moved to dismiss for lack of jurisdiction. Defendants argue that, after plaintiffs' copyright claim was dismissed, jurisdiction could be founded only upon diversity, and Dabney could not satisfy the jurisdictional amount required for diversity cases.

Diversity jurisdiction under 28 U.S.C. § 1332(a)(1) is appropriate only where complete diversity exists between all parties and "the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a)(1). Where the defendant questions plaintiff's satisfaction of the amount-in-controversy requirement, the plaintiff's claim for relief prevails unless the court can conclude to a legal certainty that the claim is really for less than the jurisdictional amount. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991).

Dabney did not allege a damage figure in the Amended Complaint with regard to the right of privacy claim, but I will assume that she claims more than the $75,000 threshold for jurisdiction based on diversity of citizenship. Defendants argue, quite strenuously, that Dabney could never recover such a large amount, because, even were plaintiff entitled to recover all profits made from the sale of the Kruger catalog and the gift merchandise, her recovery would not add up to $75,000 against any of the defendants.[18] *See Chase Manhattan Bank, N.A. v. Aldridge*, 906 F.Supp. 870, 874 (S.D.N.Y.1995) (where liability is several, the amount-in-controversy requirement must be satisfied as to each defendant individually rather than on an aggregate basis).

I do not believe dismissing the Amended Complaint for failure to satisfy the amount-in-controversy requirement is appropriate here. Dabney is seeking unliquidated damages in tort for violation of her right of privacy. Recovery for such a violation encompasses both emotional damages and economic damages. *See Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 69, 77 (D.C.N.Y.1982); *Gautier v. Pro-Football, Inc.*, 278 A.D. 431, 106 N.Y.S.2d 553, (1st Dep't 1951), *aff'd*, 304 N.Y. 354, 107 N.E.2d 485 (1952). In such cases, it is appropriate to "permit the case to proceed and not predetermine whether the plaintiff could recover the minimum statutory amount," *Tongkook*, 14 F.3d at 785 (citing *Deutsch v. Hewes Street Realty Corp.*, 359 F.2d 96, 99–100 (2d Cir.1966)), and I have done so here. Defendants' alternate motion to dismiss the Amended Complaint for lack of subject matter jurisdiction is therefore denied.

18. MOCA and M.I.T. Press also point out that profits from sales occurring outside of New York could not be recovered, as the New York right of privacy statute applies only to conduct occurring within the state. *See Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH & Co.*, 150 F.Supp.2d 566, 575 n. 45 (S.D.N.Y.2001).

## IV. Motion for Attorneys' Fees and Costs

After partial success on their motion for judgment on the pleadings last July, defendants moved for attorneys' fees and costs pursuant to Fed.R.Civ.P. 54(d). Defendants sought recovery of costs and fees for defending both the copyright infringement claim and the unfair competition claim.

Section 505 of the Copyright Act provides that the court, in its discretion, may award costs and attorneys' fees to a prevailing party in a copyright action. 17 U.S.C. § 505. Factors that may be considered in determining whether to award fees include " 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.' " *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (*quoting Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (1986)). Considering these factors, I do not believe this case warrants an award of attorneys' fees and costs to defendants. As stated above, the copyright claims here involve complicated and rarely explicated provisions of the Copyright Act. Hoepker's copyright claim, while precluded by law under my analysis, was neither frivolous nor objectively unreasonable. I therefore decline to use my discretionary powers to award defendants' attorneys' fees and costs under 17 U.S.C. § 505.

Defendants also seek recovery of attorneys' fees under 15 U.S.C. § 1117(a) for defending against plaintiffs' unfair competition claim, which plaintiffs voluntarily withdrew at oral argument. Section 1117(a) gives the court power to award attorneys' fees to parties prevailing under the Lanham Act "in exceptional cases." The decision whether or not to award such fees rests within the broad discretion of the court, *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 114 (2d Cir.1988), but awards under this section are generally limited to those cases involving bad faith, malice, willfulness or fraud. *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1543 (2d Cir.1992); *Schieffelin & Co. v. Jack Co.*, 850 F.Supp. 232, 253 (S.D.N.Y.1994). This is not such a case, the unfair competition claim did not add significantly to the factual or legal burdens on defendants' attorneys, and I decline to exercise my discretion in defendants' favor by awarding attorneys' fees.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Amended Complaint is hereby granted, but defendants' motion for attorneys' fees and costs is hereby denied. The Clerk of the Court shall mark this matter as closed.

SO ORDERED.