121 Cal.Rptr.2d 431 (2002)
99 Cal.App.4th 458
Edgar WINTER and Johnny Winter, Plaintiffs and Appellants,
v.
DC COMICS, et al., Defendants and Respondents.
No. B121021.
Court of Appeal, Second District, Division Four.
June 19, 2002.
Review Granted September 11, 2002.
*432 Gipson, Hoffman & Pancione, Julia L. Ross, Corey J. Spivey and Vincent H. Chieffo, Los Angeles, for Plaintiffs and Appellants.
Victoria T. Vaught, Conway, SC, and Steven Springer for National Organization for Albinism and Hypopigmentation as Amicus Curiae on behalf of Plaintiffs and Appellants.
Weissmann, Wolff, Bergman, Coleman & Silverman, Anjani Mandavia, Julie B. Waldman and Michael Bergman, Beverly Hills, for Defendants and Respondents.
HASTINGS, J.
Plaintiffs, brothers Johnny and Edgar Winter, are well-known performing and recording musicians originally from Texas. They were born with albinism, a genetic condition resulting in lack of pigmentation. Without their consent they were depicted as the "Autumn brothers" in three out of a series of five comic books which loosely parodied the genre of singing Wild West cowboys who were battling with worm-like *433 creatures from below the surface of the earth. The series depicts appellants as villainous half-worm half-human characters.
Respondents are DC Comics, Joe Lansdale, Timothy Truman, Sam Glanzman, Time Warner Entertainment Co., L.P., and Warner Communications, Inc. The comic book miniseries was written by Lansdale, illustrated by Truman and Glanzman, and published by DC Comics, a partnership of the Warner companies.
Contending that they had been defamed and that their likenesses had been misappropriated, among other claims, appellants brought suit against respondents. The trial court summarily adjudicated the various claims and entered judgment in favor of respondents. In an unpublished opinion filed August 25, 2000, we affirmed the judgment. On November 21, 2000, the Supreme Court granted review pending "disposition of a related issue in Comedy III Productions, Inc. v. Saderup S076061...." (S091998.) Comedy III was decided on April 30, 2001 (Comedy III Productions, Inc. v. Saderup (2001) 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797, hereafter Comedy III). Review of this matter was remanded from the Supreme Court on July 25, 2001, with directions to vacate our decision filed on August 25, 2000, and to reconsider in light of Comedy III.
We reaffirm the trial court's summary adjudication of all claims except for those involving misappropriation of likeness. On the misappropriation claims, we conclude that triable issues of fact exist whether or not the comic books meet the so-called "transformative test" adopted in Comedy III. We therefore reverse the judgment and remand for further proceedings on those claims.

FACTS
In the early 1990's, Stuart Moore, Senior Editor with the Vertigo and Helix imprints of DC Comics, decided to revive "Jonah Hex," a fictional comic book "antihero." Moore solicited respondent Lansdale to author and respondent Truman to illustrate a mini-series based on the Jonah Hex character. The result was the five-volume "Jonah Hex: Two Gun Mojo." This comic book series is described as "dark humor with graphic violence, the supernatural, and Western cliches." After this miniseries, Lansdale authored and Truman illustrated a five-volume comic miniseries entitled "Jonah Hex: Riders of the Worm and Such." It is this series which is the subject of the present action and which we now summarize.
Volume 1 begins with an armed person, Stove Belly Jack, and other bounty hunters searching for Jonah Hex in order to collect on a reward issued for capture of Jonah Hex in connection with homicide charges. Jonah Hex kills the bounty hunters, heads off on horse-back, and meets up with two other travelers. The three men decide to spend the night in an abandoned shack. While at the shack, a tentacled creature emerges from the earth, decapitates the men's horses, and kills one of the men.
In volume 2, Jonah Hex and the surviving traveler leave the shack on foot. They eventually arrive at an area where they find decapitated cattle. Cowboys arrive who accuse the two of killing the cattle but Jonah Hex convinces the cowboys otherwise, and the cowboys invite Jonah and his companion to their ranch, named "Wilde West Ranch and Music and Culture Emporium." On the way back to the ranch the cowboys "all got out their gee-tars and such, and started singin'." Hex asked "Hey! Y'all got to make all that racket?" One of the cowboys responded: "Yep. *434 We're in view of the ranch. Old man Graves likes to think we do this all the time when we're out of his sight. [¶] Sometimes Graves `spects us to dance, and even recite poetry." Upon arriving at the ranch, Graves, the owner, chastised the cowboys for use of profane lyrics in their songs. One of the cowboys pointed out they had not yet reached the "better" lyrics and Graves responded: "You miss the point, sir. All you miss the point! Wilde's West Ranch is about art, not songs about diddling." Against their desires, Hex and his companion are required to take baths and clean up before dinner. At dinner, one of the cowboys tells Jonah Hex about carnivorous worms "about the size of three bulls lined head to tail!" which are killing their cattle. After dinner, while one of the cowboys is reciting poetry, a tentacled worm-like creature breaks through the wood floor and grabs him. The second edition ends with the teaser: "NEXT: THE WORMS OF OUR DISCONTENT!"
The third issue opens with Jonah Hex looking into the hole where the worm-like creature broke through the floor. Hex asks Graves to do some "serious explainin'." Graves tells Hex that the worm-like creatures used to rule the earth when it was dark and killed people for food and pleasure. When mankind discovered the weaknesses of the worms, light and fire, they drove the worms underground and sealed the tunnels to the surface. Graves ranch, named and patterned after the life and style of Oscar Wilde, was previously owned and occupied by homesteader Errol Autumn and his mail-order wife. The "Autumn brothers," Johnny and Edgar, first appear in this issue. They are described to Jonah Hex by Graves as the offspring from the rape of their human mother, Errol Autumn's wife, by a supernatural worm creature which escaped from a hole in the ground which had been blasted open by Errol Autumn in an effort to make his land farmable. The issue ends with an exchange between Hex's sidekick and Graves: "[Hex's sidekick] You're sayin' these here Autumn brothers were part worm?" [¶] [Graves] "I'm saying that they are the source of my problem young man ... and that is why I need you gentlemen ... to join us!" The last page shows the two pale and long-haired Autumn brothers on horseback wearing sunglasses. One is wearing a "duster" and a tall black stovepipe hat with feathers. The other appears to be wearing a buckskin outfit. The teaser at the end states "NEXT: THE AUTUMNS OF OUR DISCONTENT."
The cover of Issue 4 depicts the Autumn brothers with pale faces and long white hair. One brother wears the black stovepipe hat, red sunglasses, and holds a rifle. The second brother, without glasses, is depicted as red-eyed and he holds a pistol. Issue 4 is entitled "AUTUMNS OF OUR DISCONTENT" and announces that "the half-human, half-worm" Autumn brothers threaten the survival of the ranch. Jonah Hex tells the other cowboys that he plans to shoot the worms. The Autumn brothers spy on Jonah Hex while he is intimate with a cow girl. Envious, the brothers complain about how they have to resort to intercourse with dead pigs, which they then eat. Later, Edgar shoots a cousin found defecating in Edgar's pot. The brothers hear a loud "ROOAARRRRRR!" coming from the hole in the ground into which Edgar had just poured the cousin's fecal matter. Johnny responds by saying "We got to see Big Worm." In preparation to see the mother worm, the brothers remove their upper clothes, revealing green tentacles similar to the worm creatures. The brothers then meet Big Worm who performs what appears to be a biological lobotomy on them in order to bring them into line. The brothers promise to do better and return to their cabin where *435 they go to sleep, with Edgar sucking his thumb. Meanwhile, the cowboys from Wilde's West Ranch decide to go into the earth to confront the worms. The next day the Autumn brothers discuss taking back the ranch property from Graves. Johnny is depicted as killing a pig and then eating its brain. Issue 4 concludes with the Autumn brothers setting fire to the ranch, and Edgar yelling "Come on, cousins! Kill dem what got guitars first!"
In Issue 5, entitled "Cataclysm in Worm Town," Jonah Hex and a select party of ranchers, in accord with their plan to battle the "Big Worm," go underground. While they are underground, the Autumn brothers are attempting to take over the ranch. Frightened, one of the cowboys reveals that some of the ranchers have gone underground. The Autumn brothers return underground, and a battle ensues when they encounter Jonah Hex and his companions. The Autumn brothers are shot and killed, and soon afterward the mother worm is killed.
Appellants asserted nine causes of action in their suit: (1) defamation of a private figure; (2) defamation of a public figure; (3) negligent invasion of privacy; (4) invasion of privacy; (5) invasion of privacy, and appropriation of appellants' names and likenesses under Civil Code section 3344; (6) invasion of privacy, and appropriation of appellants' name and likeness under common law; (7) violation of sections 50 and 51 of the New York Civil Rights Law;[1] (8) negligence; and (9) intentional infliction of emotional distress.
Appellants alleged that the comics falsely portrayed them as "vile, depraved, stupid, cowardly, sub-human individuals who engage in wanton acts of violence, murder and bestiality for pleasure and who should be killed." They contended the names Johnny and Edgar Autumn were selected by respondents as a clear signal to readers that it was appellants who were being referenced, especially because the characters were drawn with long white hair and albino features similar to appellants. It was further alleged that the character of Johnny Autumn was depicted as wearing the tall black top hat similar to the one worn by Johnny Winter while performing on stage and in publicity photos. Appellants also noted that the title of issue 4 of the comic book series, "Autumns of Our Discontent," is a one-word modification of the famous first line from Shakespeare's play "Richard III""`Now is the Winter of our discontent'" described as a play about "a king of England reputed to have ... committed ... violent and despicable acts."
Respondents moved for summary adjudication on all causes of action not relating to misappropriation of appellants' likenesses. They argued that while the comic book Autumn brothers were partly inspired by appellants' public personae, the comic book characters were meant to be "`over-the-top' exaggerated parodies of some aspects of those personae, combined with standard Western villains." They suggested that another inspiration for the characters came from what they described as "the long-haired albino character of *436 `Bad Bob' in John Huston's 1972 classic `The Life and Times of Judge Roy Bean.'"
The trial court granted summary adjudication on each of the causes of action targeted. The court determined "the first and second causes of action for defamation of a public figure and of a private figure are barred by the First Amendment as a matter of law since a reasonable reader to whom the Work is directed cannot understand it to state or imply actual facts or events about, or conduct of, Plaintiffs." Because the third, fourth, eighth and ninth causes of action were based on the same facts, the court concluded they could not survive independently.
Respondents then moved for summary judgment or alternatively summary adjudication against the fifth, sixth and seventh causes of action. They argued that just as the First Amendment barred the claims for defamation, it should also bar each of the misappropriation claims. Appellants opposed the motion and sought leave to amend to add causes of action for statutory and common law misappropriation of names and likenesses.
The trial court denied appellants' motion for leave to amend, granted respondents' motion for summary judgment, and later entered a judgment in favor of respondents.

DISCUSSION
Grants of summary judgment or summary adjudication are reviewed de novo. (Krieger v. Nick Alexander Imports, Inc. (1991) 234 Cal.App.3d 205, 212, fn. 3, 285 Cal.Rptr. 717.) "We review the facts presented to the trial court and independently determine their effect as a matter of law. [Citations.]" (Transamerica Ins. Co. v. Superior Court (1994) 29 Cal.App.4th 1705, 1713-1714, 35 Cal.Rptr.2d 259.) In doing so, we first look to the operative pleading which is determinative of the material issues to be addressed on a motion for summary judgment. The moving party has the duty to identify the material issue to be addressed, demonstrate how the undisputed facts apply to the specific issue raised, and supply legal authority to explain how the facts entitle the moving party to judgment as a matter of law. (Juge v. County of Sacramento (1993) 12 Cal. App.4th 59, 67,15 Cal.Rptr.2d 598.)

1. The Causes of Action Other Than for Misappropriation

We first consider summary adjudication of the first and second causes of action for defamation. This tort "involves a publication which is false, defamatory and unprivileged, and which has a natural tendency to injure or which causes special damage." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 471, p. 558.) Defamation is either libel or slander. (Civ. Code, § 44.) Since the publication here is a comic book, the tort of libel is at issue. "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ.Code, § 45.)
Appellants, renowned musicians and performers, are public figures, an issue not significantly contested by appellants. Public figures "may not recover damages for a defamatory falsehood without clear and convincing proof that [a] false `statement was made with "actual malice"that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citations.]" (Harte-Hanks Communications v. Connaughton (1989) 491 U.S. 657, 659, 109 S.Ct. 2678,105 L.Ed.2d 562.)
*437 Where, as here, First Amendment issues are raised, we have a duty to independently examine the whole record to ensure that "`the judgment does not constitute a forbidden intrusion on the field of free expression.' [Citations.] `The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.' [Citation.]" (Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1,17, 110 S.Ct. 2695, 111 L.Ed.2d 1.)
The dispositive issue here is whether a reasonable person reading the comics could conclude that the statements in the comic book series imply an assertion of the fact. (Milkovich v. Lorain Journal Co., supra, 497 U.S. at p. 21, 110 S.Ct. 2695.) In determining this issue, "the court must place itself in the position of the ... reader, and determine the sense or meaning of the statement according to its natural and popular construction. [Citation.]" (Baker v. Los Angeles Herald Examiner (1986) 42 Cal.3d 254, 260, 228 Cal. Rptr. 206, 721 P.2d 87.) "That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." (MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 547, 343 P.2d 36.) "In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. [Citation.]" (Forsher v. Bugliosi (1980) 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716.) If there is reasonable doubt how a communication could be understood by those whom it was intended for, it is for the jury to decide the meaning of the communication. (Arno v. Stewart (1966) 245 Cal.App.2d 955, 963, 54 Cal.Rptr. 392.)
To determine whether an alleged defamatory statement is a statement of fact, we apply the "totality of circumstances" test. First, we examine the language of the statement. Second, we consider the context in which the statement was made. (Baker v. Los Angeles Herald Examiner, supra, 42 Cal.3d at pp. 260-261, 228 Cal.Rptr. 206, 721 P.2d 87.) Hustler Magazine v. Falwell (1988) 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 and Bring v. Penthouse International, Ltd. (10th Cir. 1983) 695 F.2d 438 aid us in our analysis. In both opinions, it was held, as a matter of law, that the subject publications could not reasonably be understood by the average reader as depicting true events. Both cases stand for the important concept that parody which cannot reasonably be understood by a reasonable reader as factual is protected by the First Amendment against claims of defamation.
The facts in Hustler are very similar to the facts of this case: a parody of a public person in an entertainment magazine which is presented in extreme and outrageous bad taste. After reviewing the outrageous character of political cartoons and noting their First Amendment privileges, the United States Supreme Court stated:
"Respondent contends, however, that the caricature in question here was so `outrageous' as to distinguish it from more traditional political cartoons. There is no doubt that the caricature of respondent and his mother published in Hustler is at best a distant cousin of the political cartoons described above, and a rather poor relation of that. If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm. But we doubt that there is any such standard, and we are quite sure that the pejorative description `outrageous' does not supply one. `Outrageousness' in the area of *438 political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An `outrageousness' standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. [Citation.]" (Hustler Magazine v. Falwell, supra, 485 U.S. at p. 55, 108 S.Ct. 876.)
The same basic scenario was presented in Pring, supra, which concerned an entertainment publication with an article depicting the Miss America pageant in an outrageous scenario, but involving a plaintiff who was not a public figure. The federal appellate court noted:
"Here, the underlying event described was the Miss America pageant, but it was readily apparent, with the extended description of thoughts of Charlene and other indications, that it was all fanciful and did not purport to be a factual account. In this context there are the particular three incidents which are in themselves fantasy and present levitation as the central theme and as a device to `save the world.' We have impossibility and fantasy within a fanciful story. Also of significance is the fact that some of the incidents were described as being on national television and apparently before the audience at the pageant or part of the audience. This in itself would seem to provide a sufficient signal that the story could not be taken literally, and the portions charged as defamatory could not reasonably be understood as a statement of fact." (Pring v. Penthouse International, Ltd., supra, 695 F.2d at p. 441.)
Appellants attempt to distinguish their situation from that in Pring. They urge that unlike the plaintiff in Pring, appellants have not limited their claims to the literal truth of the depictions in the comic book series. This is a difference without significance. For a libel action to be viable, it must be based on an assertion as fact material which is false or the implication of an assertion of fact which is false. (Milkovich v. Lorain Journal Co., supra, 497 U.S. at pp. 18, 21, 110 S.Ct. 2695.) Either way, the subject statement is being sued upon in the context of its alleged factual meaning.
Our review of all five of the comics at issue here leads us to conclude that no reasonable reader would believe any portion of the depiction arguably relating to appellants as factual. The story is a clever depiction of the so-called singing cowboy movies in conjunction with the Josie Wales figure that actor Clint Eastwood depicted in the movie of the same name. Additionally, it throws in the worm connection, which makes the whole story surreal and obviously of a fictitious nature. While it is true that many of the gags and depictions are violent, gross and in bad taste, that is apparently the nature of this type of genre. We cannot find the story any more offensive or believable than the parody of Jerry Falwell in Hustler magazine or the story of the Miss America beauty pageant in Penthouse magazine.
We also do not believe that appellants' albinism adds anything to the issues. "The appeal of the political cartoon or caricature is often based on exploitation of ... physical traits.... The art of the cartoonist is often not reasoned or evenhanded, but slashing and one sided." (Hustler Magazine v. Falwell, supra, 485 U.S. at p. 54, 108 S.Ct. 876.) To the extent that the cartoonist in this magazine intended to depict appellants as the Autumn brothers, and that is conceded, it would have been less effective to do so by ignoring their *439 albinism. Consequently, we do not believe the arguments made in the amicus curiae brief filed by the National Organization for Albinism and Hypopigmentation (NOAH) add anything to the legal issues addressed.
Based on the holdings of Hustler and Pring, and on our review of the entire comic book series, we conclude that the trial court was correct in granting summary adjudication of the defamation claims in favor of respondents.
Hustler and Pring, in addition, stand for the concept that state common law claims other than defamation which are based on the same parody cannot survive where defamation claims are protected. Hustler was presented to the United States Supreme Court in the context of a claim for intentional infliction of emotional distress, not defamation. Despite this, the court applied the First Amendment standard to preclude the action from proceeding. In Pring the federal appellate court addressed the case in the context of defamation, but also stated: "It would serve no useful purpose to treat separately the `false light' cause of action nor the `outrageous conduct' doctrine sought to be injected into the trial, as the same First Amendment considerations must be applied." (Pring v. Penthouse International, Ltd., supra, 695 F.2d at p. 442.) This reasoning would seem to apply to all remaining claims in this action except for those relating to misappropriation.

2. The Misappropriation Claims

Section 3344 is the statute upon which appellants base their fifth cause of action. It states in part: "(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof." (Stats.1984, ch. 1704, § 2, p. 6172.)
Comedy III involved a statutory claim of misappropriation of the likenesses of The Three Stooges, each of whom deceased, pursuant to former Civil Code section 990.[2] The Supreme Court noted that section 990 "was evidently modeled on section 3344: many of the key provisions of the two statutory schemes were identical." (Comedy III, supra, 25 Cal.4th at p. 392, 106 Cal.Rptr.2d 126, 21 P.3d 797.)
The primary issue addressed by Comedy III was the extent to which the First Amendment affords protection to artistic expression of celebrity likeness in a product which is sold to the public. Comedy III Productions, Inc., the registered owner of all rights to The Three Stooges, sued Gary Saderup and Gary Saderup, Inc. (collectively Saderup) for monetary and injunctive relief for violation of former section 990. Saderup, without Comedy III's consent, sold lithographs and T-shirts bearing a likeness of The Three Stooges reproduced from a charcoal drawing made by Saderup. The trial court concluded that Saderup had violated section 990 and *440 awarded damages and injunctive relief in favor of Comedy III. The Court of Appeal modified the judgment by striking the injunctive relief but otherwise affirming the award of damages.
The Supreme Court affirmed the Court of Appeal. In doing so, Justice Mosk, writing for a unanimous court, formulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." (Comedy III, supra, 25 Cal.4th at p. 391, 106 Cal.Rptr.2d 126, 21 P.3d 797.) The issue is addressed as an affirmative defense: "[W]hen an artist is faced with a right of publicity challenge to his or her work, he or she may raise as affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." (Id. at p. 407, 106 Cal.Rptr.2d 126, 21 P.3d 797, italics added.)
The test announced was an adoption of the "transformative use" element from the "fair use doctrine" utilized within federal copyright law. Justice Mosk explained its application as follows:
"This inquiry into whether a work is `transformative' appears to us to be necessarily at the heart of any judicial attempt to square the right of publicity with the First Amendment.... When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist. [Citation.]
"On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity. As has been observed, works of parody or other distortions of the celebrity figure are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect. [Citation.] Accordingly, First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity." (Comedy III, supra, 25 Cal.4th at pp. 404-405, 106 Cal.Rptr.2d 126, 21 P.3d 797, fn. omitted.)
The opinion emphasized "that the transformative elements or creative contributions that require First Amendment protection are not confined to parody and can take many forms, from factual reporting [citation] to fictionalized portrayal [citations], from heavy-handed lampooning [citation] to subtle social criticism [citation]. [¶] ... [¶] We further emphasize that in determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contributionvulgar forms of expression fully qualify for First Amendment protection. [Citations.] On the other hand, a literal depiction of a celebrity, even if accomplished with great skill, may still be subject to a right of publicity challenge. The inquiry is in a sense more quantitative than qualitative, asking whether the literal and imitative or the creative elements predominate in the work." (Comedy III, supra, 25 Cal.4th at pp. 406-407, 106 Cal. Rptr.2d 126, 21 P.3d 797, fn. omitted.)
*441 "Furthermore, in determining whether a work is sufficiently transformative, courts may find useful a subsidiary inquiry, particularly in close cases: does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted? If this question is answered in the negative, then there would generally be no actionable right of publicity. When the value of the work comes principally from some source other than the fame of the celebrityfrom the creativity, skill, and reputation of the artistit may be presumed that sufficient transformative elements are present to warrant First Amendment protection. If the question is answered in the affirmative, however, it does not necessarily follow that the work is without First Amendment protectionit may still be a transformative work." (Comedy III, supra, 25 Cal.4th at p. 407, 106 Cal.Rptr.2d 126, 21 P.3d 797.)
The Supreme Court concluded that the original charcoal drawing by Saderup was protected but it found no significant transformative or creative contribution in the reproductions of Saderup's original charcoal drawing in lithographic form or on the T-shirts. "His undeniable skill is manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame.... [¶] Moreover, the marketability and economic value of Saderup's work derives primarily from the fame of the celebrities depicted. While that fact alone does not necessarily mean the work receives no First Amendment protection, we can perceive no transformative elements in Saderup's works that would require such protection." (Comedy III, supra, 25 Cal.4th at p. 409, 106 Cal.Rptr.2d 126, 21 P.3d 797.)
The question facing us is whether or not depiction of appellants' likenesses in volumes three through five of the comic book series meets the "transformative use" test. We first note that neither the parties nor the trial court had the benefit of Comedy III when the motion for summary judgment was addressed. Thus, they did not anticipate the need to address the factual or legal issues relevant to application of this test. Reversal and remand would appear appropriate to allow the parties to develop the factual record in accord with the legal principles discussed in Comedy III and to afford the trial court an opportunity to address the issue in the first instance. (McDonald's Corp. v. Board of Supervisors (1998) 63 Cal. App.4th 612, 618, 74 Cal.Rptr.2d 101; Richmond v. Dart Industries, Inc. (1987) 196 Cal.App.3d 869, 879, 242 Cal.Rptr. 184.)
Respondents argue that we can determine the issue as a matter of law given the undisputed facts and by reviewing the comic books. Respondents contend that "even if the Winters' identities and stage personae's [sic] are considered one of many `raw materials' from which the work has been fabricated, those raw materials have been entirely transfigured by Respondents' creativity, imagination, and humor into the inhuman, fantastical Autumn brother creatures, requiring that full First Amendment protection be accorded to the work." We are not persuaded.
At oral argument, respondents' counsel argued that the comic books are a parody and are thus entitled to protection. The issue of parody in connection with "transformative use" was addressed in Dr. Seuss Enterprises, L.P. v. Penguin Books (9th Cir.1997) 109 F.3d 1394. There, defendants were being sued for copyright infringement based on publication of a book about the O.J. Simpson murder trial titled "The Cat NOT in the Hat! A Parody by Dr. Juice." Plaintiff contended that the work infringed upon books published by it, particularly the book "The Cat in the Hat." *442 The Ninth Circuit determined that defendants' book was not a parody in the legal sense because it did not, even in part, target plaintiffs copyrighted work. It reached this conclusion because the stanzas and illustrations in the contested publication simply retold the homicide events from the Simpson trial and did not hold the style of Dr. Seuss up to ridicule, it merely broadly mimicked the characteristic style of Dr. Seuss: "Because there is no effort to create a transformative work with `new expression, meaning, or message,' the infringing work's commercial use further cuts against the fair use defense. [Citation.]" (Id. at p. 1401, fn. omitted.) The Ninth Circuit quoted from the decision of the United States Supreme Court in Campbell v. Acuff-Rose Music, Inc. (1994) 510 U.S. 569, 580, 114 S.Ct. 1164, 127 L.Ed.2d 500, on what constitutes parody: "`Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.' [Citation.]" (Dr. Seuss Enterprises, L.P. v. Penguin Books, supra, 109 F.3d at p. 1400.)
We agree with respondents that the comic books themselves are artistic works of art which may qualify for treatment under the "transformative use" as parody. But the parody we perceive relates to the character of Jonah Hex and the singing cowboy genre depicted.[3] Other than use of their likenesses, there does not appear to be any parody attributed to appellants, their musical talent, or their works or performances. In fact, Truman testified at his deposition that it was his idea to name the Autumn Brothers "Edgar and Johnny, as a tip of the hat." Respondents also suggested that the Autumn brothers were in part intended to be a tribute to the fictional, villainous, albino character "Bad Bob" from the movie "The Life and Times of Judge Roy Bean."
From the promotional material, it is reasonable to infer that respondents were trading on appellants' likenesses and reputations to generate interest in the upcoming releases and to garner sales. In a promotional interview regarding the comic book series, Truman and Lansdale state: "Truman: We have Johnny and Edgar Winter in this one, too. [¶] Lansdale: The Autumn Brothers." Promotional descriptions of the series stated "Johnny and Edgar are the Autumn Brothers." The series was marketed in a comic book newspaper using a tantalizing ploy: "`... if you want to discover ... exactly how rockers Johnny and Edgar Winter sort of turn up in Riders of the Worm and Such, you'll just have to wait.'"
We conclude that triable issues of fact exist whether or not the use of appellants' likenesses in the comic books qualifies as a "transformative use" and that the judgment must be reversed and the matter remanded to the trial court.
We do not specifically address the sixth and seventh causes of action or reach the issue of whether the trial court erred in refusing to allow appellants to amend their complaint to assert other misappropriation claims. On remand we have no doubt that each side may desire to review, amend and initiate further challenges to the pleadings in light of the principles addressed in Comedy III.

*443 DISPOSITION
The judgment is reversed and the matter is remanded for further proceedings on the claims for misappropriation of likeness. The order granting summary adjudication of the remaining causes of action (1, 2, 3, 4, 8 and 9) is affirmed. Each side is to bear its own costs.
We concur: CHARLES S. VOGEL, P.J. and CURRY, J.
NOTES
[1] The cause of action citing New York statutory law alleges in part: "Defendants have used Plaintiffs' names, portraits and likenesses within the State of New York and elsewhere for the purposes of trade without having obtained Plaintiffs' written consent, in violation of Sections 50 and 51 of the Civil Rights Law of the State of New York and of similar statutes and/or common law principles in other jurisdictions in which defendants have engaged in such conduct." The cause of action seeks compensatory and punitive damages, and injunctive relief.
[2] That section provided in part: "(a) Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof." (Stats.1984, ch. 1704, § 1, p. 6169.) In 1999, the Legislature renumbered the statute as section 3344.1 and changed the wording somewhat. (Comedy III, supra, 25 Cal.4th at p. 391, fn. 1, 106 Cal.Rptr.2d 126, 21 P.3d 797.)
[3] As we noted in connection with our discussion of the defamation claims, it appears that the Jonah Hex character may have been based upon the character of Josie Wales played by Clint Eastwood in the movie of the same name.